**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| In re: | ) | |
|     RONALD G. MCMARTIN, JR., | ) | |
| | ) | |
| Debtor, | ) | Chapter 7 |
| | ) | No. 17-30558 |
| BMO HARRIS BANK N.A., | ) | Judge Shon Hastings |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. |
| | ) | |
| RONALD G. MCMARTIN, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**ADVERSARY COMPLAINT TO DETERMINE THE DISCHARGEABILITY OF**
**CERTAIN DEBT UNDER 11 U.S.C. § 523(a)**

Plaintiff, BMO Harris Bank N.A. (*"BMO"* or *"Plaintiff"*), through its undersigned counsel, Chapman and Cutler LLP and Conmy Feste Ltd., respectfully submits its Adversary Complaint to Determine the Dischargeability of Certain Debt Under 11 U.S.C. § 523(a) against Ronald G. McMartin Jr. (*"McMartin Jr."*).

**JURISDICTION**

1.    This Court has core jurisdiction over this action pursuant to 28 U.S.C. § 157(b)(2)(I).

2.    This Court has jurisdiction over matters arising in or related to a case under Title 11 pursuant to 28 U.S.C. § 1334.

3.    Venue is proper pursuant to 28 U.S.C. § 1409(a).

**PARTIES**

4.    BMO is a national bank organized under the laws of the United States of America, with its principal place of business in Chicago, Illinois.

5.    McMartin Jr. is an individual who asserts that he currently resides in St. Thomas, North Dakota.

6.    McMartin Jr. filed for relief under Chapter 7 of Title 11 of the United States Code (the *"Bankruptcy Code"*) on September 11, 2017 (the *"Petition Date"*).

7.    At all relevant times, McMartin Jr. was the President and sole shareholder of McM, Inc. (*"McM"*), a debtor in Case No. 17-30061, United States Bankruptcy Court for the District of North Dakota (the *"McM Bankruptcy Case"*).

## GENERAL BACKGROUND AND ALLEGATIONS

### A.    McMartin Jr.'s Indebtedness to BMO

8.    BMO and McM are parties to a Master Loan Agreement dated as of July 31, 2012 pursuant to which BMO extended credit to McM (the *"Master Loan Agreement"*).

9.    Under the Master Loan Agreement, BMO originally extended a $25 million revolving line of credit in July 2012 to McM for crop inputs and working capital.

10.    BMO and McM amended the Master Loan Agreement pursuant to the First Amendment to Master Loan Agreement effective as of May 14, 2013 (the *"First Amendment"*).

11.    Pursuant to the First Amendment and at McM's request, BMO increased the revolving line of credit from $25 million to $31 million and established an additional revolving line of credit of $1.5 million to finance hedging accounts (the *"Hedge Line"*).

12.    BMO and McM amended the Master Loan Agreement pursuant to the Second Amendment to Master Loan Agreement effective as of April 30, 2014 (the *"Second Amendment"*).

13.    Pursuant to the Second Amendment and at McM's request, BMO increased the revolving line of credit from $31 million to $36 million for a time, with an eventual reduction to

$32 million, and extended the maturity of the loan. In addition, and at McM's request, BMO increased the Hedge Line from $1.5 million to $4 million, and extended the maturity of that loan.

14.    BMO and McM amended the Master Loan Agreement pursuant to the Third Amendment to Master Loan Agreement effective as of April 13, 2015 (the *"Third Amendment"*).

15.    Pursuant to the Third Amendment and at McM's request, BMO made another revolving line of credit available to McM in the initial amount of $8 million (the *"Short Term Line"*).  In addition, and at McM's request, BMO (among other things) decreased the Hedge Line from $4 million back to $1.5 million.

16.    BMO and McM amended the Master Loan Agreement pursuant to the Fourth Amendment to Master Loan Agreement effective as of April 22, 2016 (the *"Fourth Amendment"*).

17.    Pursuant to the Fourth Amendment and at McM's request, BMO made a non-revolving line of credit available to McM in the amount of $8 million to fund input costs and operating expenses for the 2016 crop year (the *"2016 Input Loan"*).

18.    BMO and McM amended the Master Loan Agreement pursuant to the Fifth Amendment to Master Loan Agreement effective as of June 20, 2016 (the *"Fifth Amendment,"* and together with the First Amendment, the Second Amendment, the Third Amendment and the Fourth Amendment, the *"Amendments"*).  The Master Loan Agreement, together with the First Amendment, the Second Amendment, the Third Amendment, the Fourth Amendment and the Fifth Amendment, are collectively referred to herein as the *"Loan Agreement."*

19.    Pursuant to the Fifth Amendment and at McM's request, BMO increased the Hedge Line from $1.5 million to $2 million, and increased the 2016 Input Loan from $8 million to $9 million.

20.     When the Fifth Amendment became effective on June 20, 2016, the following loans had been made available by BMO and were then outstanding to McM:

(a)     $32 million Revolving Line of Credit;

(b)     $2 million Hedge Line; and

(c)     $9 million 2016 Input Loan.

21.     The Revolving Line of Credit is further evidenced by a First Modified Revolving Line of Credit Note dated as of April 30, 2014 and the Replacement Allonge to First Modified Revolving Line of Credit Note (Revolver) dated as of April 22, 2016 (collectively, the *"Revolving Line of Credit Note"*).

22.     The Hedge Line is further evidenced by a First Modified Revolving Line of Credit Note (Hedging) dated as of April 13, 2015, a Replacement Allonge to First Modified Revolving Line of Credit Note (Hedging) dated as of April 22, 2016 and a Second Allonge to First Modified Revolving Line of Credit Note (Hedging) dated as of June 20, 2016 (collectively, the *"Hedge Line Note"*).

23.     The 2016 Input Loan is further evidenced by a Non-Revolving Note dated as of April 22, 2016, and Allonge to Non-Revolving Line of Credit Note dated as of June 20, 2016 (collectively, the *"Non-Revolving Note"*). The Revolving Line of Credit Note, the Hedge Line Note and the Non-Revolving Note are referred to collectively as the *"Notes."*

24.     To induce BMO to extend the credit described above, and to secure the obligations of McM, McM granted BMO a security interest in all of its personal property, as more fully described in the Security Agreement dated as of July 31, 2012 (the *"McM Security Agreement"*). Section 3 of the McM Security Agreement establishes that BMO has a "blanket" security interest in all personal property assets of McM.

- 4 -

25.    Included in the pledged assets are McM's interest in various partnerships, limited partnerships, joint ventures and other entities or business arrangements growing sugar beets for sale to American Crystal Sugar Company (collectively, the *"Beet Partnerships"*), including but not limited to: (a) McMartin – LN Limited Partnership, (b) McMartin - MN Limited Partnership, (c) McM, Inc. Limited Partnership III, (d) McM, Inc. Limited Partnership XV, (e) MCM, Inc. Limited Partnership XI, (f) McM, Inc. and Pyle Farms, Inc. Joint Venture, (g) McM, Inc. Limited Partnership XIV, (h) McM Limited Partnership XVII, (i) McM-Davis Joint Venture, (j) McM-Van Camp Joint Venture, (k) Jacaranda Limited Partnership, (l) McM, Inc. – FMH Co., (m) McM, Inc. Sugar Beet Limited Partnership I, (n) McM, Inc. Limited Partnership V, (o) McM, Inc. J.V. James M Guy and Jane M. Guy, (p) GM-KW Limited Partnership, (q) Gail McMartin Farms Limited Partnership I, (r) Gail McMartin Farm LLLP III and (s) Gail McMartin – McM Inc. Joint Venture. The interests pledged included the unit retains for shares in American Crystal Sugar Company.

26.    BMO perfected its interests in the McM's personal property collateral by filing (together, the *"McM Perfection Documents"*) (a) a UCC Financing Statement with the North Dakota Secretary of State on August 1, 2012 as document number 12-000763463-0, (b) a UCC Financing Statement with the Minnesota Secretary of State on August 1, 2012 as document number 201229134110, (c) a farm products central notice filing financing statement with the North Dakota Secretary of State on July 22, 2016 as document number 16-000077497-1, (d) a farm products central notice filing financing statement with the North Dakota Secretary of State on August 2, 2016 as document number 16-000081990-0, and (e) a farm products central notice filing financing statement with the Minnesota Secretary of State on August 3, 2016 as document number 89728990037.

27.     To induce BMO to extend the credit described above, McMartin Jr. executed and delivered to BMO a Guaranty dated July 31, 2012 (the *"Debtor Guaranty"*).

28.     McMartin Jr. acknowledged and confirmed the Debtor Guaranty in Acknowledgements executed and delivered by him to BMO dated April 30, 2014, April 22, 2016 and June 20, 2016.

29.     To induce BMO to extend the credit described above, and to secure his obligations to BMO, McMartin Jr. granted to BMO a security interest in all of his personal property, as more fully described in the Security Agreement dated as of July 31, 2012 and Addendum dated as of April 30, 2014 (together, the *"Debtor Security Agreement"*).

30.     BMO perfected its interest in McMartin Jr.'s personal property collateral by filing a UCC Financing Statement with the North Dakota Secretary of State on August 1, 2012 as document number 12-000763466-3, and by filing a continuation statement with the North Dakota Secretary of State on July 21, 2017 as document number 17-000245412 (together, the *"McMartin Jr. UCC Statements"*).

31.     The Loan Agreement, the Notes, the Debtor Guaranty, the McM Security Agreement, the Debtor Security Agreement, the McM Perfection Documents, the McMartin Jr. UCC Statements, and other documents delivered pursuant to or in connection with the Loan Agreement and the Debtor Guaranty, are referred to herein as the *"Loan Documents."*

32.     All obligations owed by McM under the Loan Documents are secured by valid, continuing and properly perfected first-priority security interests and liens granted by McM in its personal property.

33.     All obligations owed by McMartin Jr. under the Loan Documents are secured by valid, continuing and properly perfected first-priority security interests and liens granted by McMartin Jr. in his personal property.

- 6 -

B.    **McMartin Jr.'s False Statements to BMO**

34.    As described in further detail below, McMartin Jr. made oral and written false or misleading statements to BMO.   McMartin Jr. also failed to disclose to BMO accurate information known to him.

1.    **False Financial Statements**

35.    To induce BMO to enter into the Loan Documents, McMartin Jr. provided BMO with reviewed financial statements for McM's fiscal years ending December 31, 2011 through December 31, 2015.   McMartin Jr. also provided BMO with reviewed quarterly financial statements for McM.

36.    The 2011, 2012 and 2013 financial statements were prepared by the accounting firm of Mortenson & Rygh.

37.    The 2014 and 2015 financial statements were prepared by the accounting firm of Eide Bailly LLP.

38.    The financial statements were prepared in material part based on information provided by McMartin Jr.

39.    The financial statements were approved by McMartin Jr. after they were prepared by Mortenson & Rygh and Eide Bailly LLP and before they were provided to BMO.

40.    The financial statements for 2011, 2012 and 2013 stated, in Note 1:

> Financial statements are reported using the economic resources measurement focus and the accrual basis of accounting.  Revenues are recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. The exception to this method is that harvested crop inventories are valued at net realizable value at year end rather than cost.  This is common practice for farms and correctly matches revenues earned with cost of production for the crop year cycle.

41.    Section 5.7 of the Master Loan Agreement required that the financial statements provided to BMO be prepared in accordance with generally accepted accounting principles (*"GAAP"*).

42.    GAAP requires accrual accounting where (among other things) a liability is recognized even though the money is not physically spent at the time the liability is incurred.

43.    At his Bankruptcy Rule 2004 examination on October 18, 2017, McMartin Jr. testified that Ramsey National Bank and Rabo Agrifinance, which had been McM's working capital lenders before BMO, also required that that McM's financial statements be prepared on the accrual basis of accounting.

44.    McMartin Jr.'s statements in the financial statements were knowingly and materially false.  Among other false statements, McMartin materially misstated the value of McM's accounts receivable and inventory and the amount of accounts payable.

45.    The amount of accounts payable were materially misstated in the financial statements because McM had unpaid liabilities for crop inputs, including seeds, chemicals and fertilizer, which were not recognized on the financial statements as liabilities at the time they were incurred.  McM and McMartin Jr. had a regular practice of failing to recognize accounts payable as liabilities prior to 2012.

46.    For example, on February 18, 2016 and March 23, 2016, and to induce BMO to enter into the Fourth Amendment, pursuant to which BMO made a non-revolving line of credit available to McM in the amount of $8 million to fund crop input (including seed, chemicals and fertilizer) costs and operating expenses for the 2016 crop year, McMartin Jr. provided BMO with draft and then final unaudited, reviewed financial statements for McM's fiscal year ending December 31, 2015 (the *"FYE 2015 Financial Statements"*).

- 8 -

47.    In the FYE 2015 Financial Statements, McMartin Jr. represented to BMO crop and livestock inventory of $13,672,974, total accounts payable of $24,660, and accrued liabilities of $204,116.  The FYE 2015 Financial Statements also showed $3,390,834 as an asset under the heading "Investment in Future Crop" for seed, chemicals and fertilizer.  The notes to the FYE 2015 Financial Statements stated that "Investment in future crop consists primarily of costs incurred for the following crop year and are capitalized and recorded as current assets."

48.    McMartin Jr.'s statements in the FYE 2015 Financial Statements were materially false. In March 2016, McM had unpaid liabilities for 2015 crop inputs in the amount of at least $3,000,000.00 because, unbeknownst to BMO, McM paid for crop inputs in arrears, not in advance, and failed to report the unpaid crop inputs as a liability on its FYE Financial Statements. Thus, when McM approached BMO in March 2016 for additional loans to purportedly fund 2016 crop input expenses, and again unbeknownst to BMO, McM actually needed the funds to pay its crop input liabilities for the prior year.

49.    The FYE 2015 Financial Statements were also materially false because McMartin Jr. misstated $3,390,834 as an "Investment in Future Crop" asset when no such asset existed.

50.    The FYE 2015 Financial Statements were also materially false because McMartin Jr. misstated the value of crop inventories and accounts receivable.

51.    On May 12, 2016, to induce BMO to enter into the Fifth Amendment by which BMO increased the Hedge Line from $1.5 million to $2 million and increased the 2016 Input Loan from $8 million to $9 million, McMartin Jr. provided BMO with McM's unaudited, reviewed financial statements as of March 31, 2016 (the *"March 2016 Financial Statements"*). The March 2016 Financial Statements contained material misstatements concerning potato inventory, including inventory value, sales and receivables.

## 2.    False Cash Flow Budgets

52.    To induce BMO to enter into the Loan Documents, McM also provided BMO with cash flow budgets, and comparisons of actual to budgeted cash flows, based on information provided by McMartin Jr. These documents were knowingly and materially false. Among other material misstatements, McMartin Jr. misstated the value of McM's accounts receivable and inventory, the amount of accounts payable, and the number of acres planted by McM.

53.    For example, to induce BMO to enter into the Fourth Amendment, in February 2016 and thereafter, McMartin Jr. provided BMO with cash flow budgets, and comparisons of actual to budgeted cash flows, for February, March and April 2016.

54.    The March 2016 cash flow budget, purportedly setting forth projected 2016 revenues as well as expenses for crop inputs, harvest and storage, was represented to be based upon McM planting 38,761 acres to make it look as though the cost per acre was reasonable and that McM was reasonably expecting certain revenues to be paid as a result of sales of its 2015 potato harvest.

55.    McMartin Jr.'s statements in and regarding the cash flow budgets delivered to BMO in February, March and April 2016 were materially false.  McMartin Jr. significantly overstated expected revenues and failed to advise BMO that it was farming only approximately 29,087 acres in 2016, making its budget (and loan request) overinflated for the anticipated expenses to plant, harvest and process that amount of acreage.

56.    On June 17, 2016, McMartin Jr. provided BMO with a cash flow budget to actual comparison from January through May 2016 for McM. When compared to the March 2016 Financial Statements, the accounts receivable collections shown in the cash flow budget revealed a variance of more than $2.7 million.

### 3.    Other False Statements and Omissions by McMartin Jr.

57.    Contrary to a spreadsheet prepared and delivered by McMartin Jr. to BMO showing that McM planned to plant 38,761 acres for the 2016 crop year, more than 9,451 of those acres were in fact acres subsequently reported to be owned by Ronald G. McMartin, Sr. and/or Bonita McMartin, the parents of McMartin, Jr. (*"McMartin Sr."* or *"Sr."*).

58.    On June 29, 2016, McM retained James E. Harney (*"Harney"*) as a turnaround consultant.

59.    On or about July 8, 2016, during a conference call, Harney stated to BMO that projected potato proceeds for 2015 would be approximately $7 million, versus $10 million as previously projected by McMartin Jr.

60.    Given the lack of answers and transparency by McMartin Jr., and Harney's report of the projected potato crop inventory for 2015, on July 12, 2016 BMO retained Agribusiness Consulting Group, LLC (*"Agribusiness Consulting"*) to complete a field audit of 2015 crop year potato inventories, sales and receivables. The field audit report, completed in August 2016, showed materially different facts than information provided to BMO by McMartin Jr.

61.    At a meeting on July 25, 2016 in Grand Forks, North Dakota, BMO, Harney, members of his team, and McMartin Jr. discussed accounts payable. During the meeting, BMO asked McMartin Jr. if there were amounts owed to vendors such as Kelley Bean and American Crystal Sugar Company and other vendors for seed for the 2016 crop season, which would be deducted from the proceeds of crop sales. McMartin Jr. responded that there would be amounts owed to Kelly Bean and American Crystal Sugar Company.  Based on the discussion at this meeting, Harney and his team indicated that they would need to revise the accounts payable listing.

62.    BMO was subsequently provided with an accounts payable listing as of July 29, 2016 which showed approximately $4 million in payables to crop-related vendors. Subsequent to

July 29, 2016, Harney and his team identified additional payable obligations due to vendors Crop Production Services and Columbia Grain which together amounted to an additional $4.38 million.

63.     Thereafter, at a subsequent meeting on August 23, 2016 with McMartin Jr. and Harney in Grand Forks, North Dakota, BMO discussed and quantified the additional payables to vendors Crop Production Services and Columbia Grain with McMartin Jr. and Harney. They also discussed the fact that there were payables to these vendors for the 2015 crop season, in the amount of approximately $3 million, which were paid with the 2016 loan funds. Laurie Mueller on behalf of BMO stated that because these payables were not disclosed on the financial statements dated December 31, 2015 and March 31, 2016 provided to BMO, such financial statements were inaccurate. McMartin Jr. did not dispute Mueller's statement.

64.     Because the 2016 loan funds had been used to pay 2015 crop input expenses, McM obtained additional input financing of more than $5.6 million for the 2016 crop from other vendors and lenders. McMartin Jr. admitted these facts to BMO only after he was presented with UCC financing statements and credit reference requests submitted to BMO by third parties reflecting these circumstances.

65.     While the 2016 loan funds had also been used by McM to make lease payments on the land used for the 2016 crop, BMO did not realize the full benefit from these lease payments, because the crops planted in 2016 resulted in liens in favor of other lenders, not BMO.

66.     In September 2015, McMartin Jr. had stated that part of the source of funds used to repay a short-term line of credit with BMO in 2015 were proceeds from 2014 potato sales, and he provided BMO with a report generated from the McM's QuickBooks system showing payments as being received from potato sales.

67.    The entries in QuickBooks were purposely altered by or upon the direction of McMartin Jr. to reflect that the source of the repayment funds was from the sale of potatoes when this was false.

68.    As a result of his review of McM's actual financial information, as opposed to what had been materially misstated to BMO, Harney concluded that McM's accounts receivable and inventory were overstated by at least $11 million.

69.    On August 9, 2016, McM retained Harney to act as its chief restructuring officer (*"CRO"*).

70.    On or about August 22, 2016, Harney delivered a memorandum to BMO (the *"Harney Memorandum"*).

71.    McMartin Jr. directly or indirectly required Harney to delete material information about McM's assets, liabilities and financial condition from the Harney Memorandum for the purpose of deceiving BMO.

72.    Harney resigned as CRO of McM on or about September 7, 2016.

73.    In September 2016, Davis Jackson, who previously had been retained by Harney to perform internal accounting duties for McM, was appointed as interim chief financial officer of McM.

74.    Laurie Mueller of BMO spoke on the telephone with Davis Jackson on September 20, 2016. During that phone conversation, Davis Jackson stated that McM used its accounts with input suppliers to purchase inputs for acres owned by McMartin Sr. for the 2016 crop season. Davis Jackson stated there was most likely "profit shifting" between McM and McMartin Sr. that had gone on for several years.

**B.      McMartin Jr. Targets BMO with Improper Use of McM's Bank Accounts and Conversion of BMO's Collateral**

75.      McM maintained two bank accounts for its operations and lending arrangement with BMO.  The first account, established at BMO, received proceeds of BMO's collateral as they were paid by third parties, and funded McM's operating expenses.  The second account, at Ramsey National Bank in North Dakota, was established and was restricted to the sole purpose of funding McM's payroll expenses pursuant to Section 2.2.1A of the Fourth Amendment (the *"First Ramsey Account"*).

76.      BMO repeatedly told McMartin Jr. that the First Ramsey Account was to be used solely for payroll transactions.  Section 5.7.1.1C of the Fourth Amendment also required McM to provide BMO with a copy of the deposit account statement for the First Ramsey Account within 15 days of the end of the month.

77.      In July 2016, Harney informed BMO that McM and McMartin Jr. had used the First Ramsey Account to conceal transactions from BMO, including that deposits had been made into the First Ramsey Account to prevent BMO from confirming the source of funds used to repay the short-term line in 2015.

78.      On November 3, 2016, McMartin Jr. caused McM to open a second account at Ramsey National Bank (the *"Second Ramsey Account"*).  The existence of the Second Ramsey Account was hidden from BMO.  BMO did not learn of the Second Ramsey Account until after McM filed its chapter 7 petition.

79.      Without BMO's knowledge, McMartin Jr. caused McM to deposit proceeds of BMO's collateral related to McM's beet crop into the Second Ramsey Account, and for such funds to be converted and dissipated without BMO's knowledge or consent.

80.     Deposits totaling $988,340.77 were made into the Second Ramsey Account between the time it was opened and when it was closed.  Only $8,039.30 of such funds were eventually turned over to the chapter 7 Trustee.

81.     In the fall of 2016, McM requested that BMO fund or permit use of BMO's collateral proceeds for expenses, including payroll, that had already been paid by McM from the Second Ramsey Account.

82.     In the fall and winter of 2016, McM failed and refused to provide BMO with information requested by BMO that would permit BMO to verify whether BMO's collateral was used without BMO's permission or not turned over to BMO as required by the Loan Documents. McMartin Jr. further refused to provide BMO with bank statements for the First Ramsey Account for the months of November and December 2016.

83.     The account statements for the First Ramsey Account for the months of November and December 2016 reflect that McM made a payment to John Deere Financial in the amount $208,000 pursuant to the terms of an Order for Claim and Delivery entered on November 16, 2016 in a lawsuit brought against McM and McMartin Jr. by John Deere Financial (Pembina County, ND District Court Civil No. 34-2016-CV-00149).  This payment was not disclosed to BMO prior to the funds being paid over to John Deere.  McMartin Jr. falsely represented to John Deere Financial that the $208,000 payment was free and clear of any liens, encumbrances or claims of any third parties, including BMO.

84.     McMartin Jr. caused McM to leave open the First Ramsey Account and the Second Ramsey Account, from and after February 10, 2017, when it filed its chapter 7 bankruptcy petition, so that checks could continue to clear the accounts and withdrawals could continue to be made, in violation of the Bankruptcy Code.

- 15 -

C.     McMartin Jr. Targets BMO by Funneling Assets to His Parents

85.    For the 2014 and 2015 crop years, McM farmed approximately 50,000 acres of land leased or owned by McM.

86.    For the 2016 crop year, McM farmed approximately 29,087 acres of land leased or owned by McM.

87.    During the 2016 crop year, unbeknownst to BMO, McM also provided custom harvesting services to McMartin Sr. for approximately 9,451 acres of land owned or leased by McMartin Sr.

88.    The custom harvesting services for McMartin Sr. involved (a) McMartin Jr. causing McM to obtain and pay for crop inputs for the land owned or leased by McMartin Sr., and (b) McMartin Jr. causing McM employees and equipment to harvest the crops grown on the land owned or leased by McMartin Sr.

89.    On information and belief, the custom harvesting services for McMartin Sr. also involved McMartin Jr. causing McM to make payments under farmland leases on which McMartin Sr. was the lessee.

90.    In providing the custom harvesting services for McMartin Sr., McMartin Jr. caused McM to use its funds, assets and employees for the benefit McMartin Sr., without equivalent value paid or given by McMartin Sr. in exchange.

91.    For the 2016 crop year, McMartin Jr. chose to farm fewer McM acres than McM had farmed in prior years.  McMartin Jr. also chose to farm more McMartin Sr. acres than McM had farmed in prior years, for the purpose of diverting money away from BMO and to McMartin Sr., and directly or indirectly benefitting himself.

**D.    McMartin Jr. Targets BMO by Converting the Proceeds of BMO's Livestock Collateral**

92.    In late January 2017, on the eve of McM's bankruptcy filing, unbeknownst to BMO, and without BMO's consent, McMartin Jr. caused McM to sell livestock in which BMO had a security interest, for $114,919.40.  The proceeds of the sale were deposited in the Second Ramsey Account.

93.    A portion of the proceeds ($25,000) were paid to Northdale Oil, which asserted a statutory lien in the livestock.  None of the proceeds were paid to BMO, in violation of the Loan Documents.

**E.    McMartin Jr. Targets BMO by Converting Proceeds of BMO's Collateral for Use in His Island Lake Minnesota Vacation Home**

94.    The Trustee in the McM Bankruptcy Case has commenced an adversary proceeding (Case No. 17-7028) in which he alleges actual fraud by McMartin Jr. in connection with the transfer of real property located in Island Lake, Minnesota (the *"Island Lake Property"*) from McM to an irrevocable trust established by McMartin Jr.

95.    Unbeknownst to BMO, McMartin Jr. caused McM to use the proceeds of BMO's collateral in significant amounts to improve and maintain the Island Lake Property.

**F.    McMartin Jr. Found in Contempt by the Court Presiding Over His Divorce Case for Similar Conduct**

96.    On April 17, 2017, the court presiding over McMartin Jr.'s state court divorce proceeding, Case No. 18-10-C-01916, State of North Dakota, County of Grand Forks, District Court for the Northeast Central Judicial District (the *"Divorce Case"*), entered an Order on Motion for Contempt (the *"Contempt Order"*).

97.    In the Contempt Order, the court found that McMartin Jr. had engaged in willful, intentional, and inexcusable conduct in benefiting himself financially instead of paying to his ex-wife the amounts due to her under their divorce decree.

98.     The same self-dealing conduct by McMartin Jr. which the court found to be willful, intentional and inexcusable as to his ex-wife, also harmed McMartin Jr.'s other creditors, including BMO.

99.     On or about March 17, 2017, McMartin Jr. signed under oath and caused to be filed in the Divorce Case a false personal financial statement setting forth false information about his personal income and expenses.

**G.     McMartin Jr. Targets BMO by Converting the Proceeds of BMO's Collateral**

100.    McMartin Jr. entered into an Equipment Lease Agreement with A&L Potato Company dated June 22, 2016 relating to a Halo 1000 3-Way Potato Sorter (the *"A&L Lease"*).

101.    Pursuant to the A&L Lease, A&L made rent payments to McMartin Jr. in 2016 and 2017.

102.    Such rent payments constituted "payment intangibles," which are one of the categories of assets in which McMartin Jr. granted security interests to BMO.

103.    Despite demand by BMO, McMartin Jr. refused to turn over to BMO the A&L rent payments, but instead retained and spent the funds for his own benefit.

104.    McMartin Jr. also deposited one or more checks made payable to McM into his personal bank account at Wells Fargo Bank.

**FIRST CLAIM FOR RELIEF**
**DETERMINATION OF DISCHARGEABILITY, 11 U.S.C. § 523(a)(2)(A)**

105.    Plaintiff incorporates by this reference all statements and allegations contained in paragraphs 1 through 104 as though more fully set forth in this Claim for Relief.

106.    McMartin Jr., as the President and sole shareholder of McM, made misrepresentations to BMO, including specific misrepresentations regarding McM's assets and liabilities, to induce BMO to enter into the Loan Documents.

107.    McMartin Jr. made the misrepresentations with knowledge that they were false.

108.    McMartin Jr. made the representations deliberately, for the purpose of deceiving BMO.

109.    BMO justifiably relied on the misrepresentations made by McMartin Jr.

110.    BMO would not have entered into the Loan Documents but for the misrepresentations made by McMartin Jr.

    **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against McMartin Jr., determining that the claims held by Plaintiff against McMartin Jr. are excepted from McMartin Jr.'s discharge under the provisions of 11 U.S.C. § 523(a)(2)(A), for Plaintiff's costs, including reasonable attorneys' fees, as provided by law and/or agreement, and for such other and further relief as the Court deems appropriate.

### SECOND CLAIM FOR RELIEF
### DETERMINATION OF DISCHARGEABILITY, 11 U.S.C. § 523(a)(2)(B)

111.    Plaintiff incorporates by this reference all statements and allegations contained in paragraphs 1 through 110 as though more fully set forth in this Claim for Relief.

112.    McMartin Jr., as the President and sole shareholder of McM, made materially false written statements to BMO about McM's financial condition to induce BMO to enter into the Loan Documents.

113.    McMartin Jr. made the materially false written statements with knowledge that they were false.

114.    McMartin Jr. made the materially false written statements for the purpose of deceiving BMO.

115.    BMO justifiably relied on the materially false written statements made by McMartin Jr.

116.    BMO would not have entered into the Loan Documents but for the materially false written statements made by McMartin Jr.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against McMartin Jr., determining that the claims held by Plaintiff against McMartin Jr. are excepted from McMartin Jr.'s discharge under the provisions of 11 U.S.C. § 523(a)(2)(B), for Plaintiff's costs, including reasonable attorneys' fees, as provided by law and/or agreement, and for such other and further relief as the Court deems appropriate.

### THIRD CLAIM FOR RELIEF
### DETERMINATION OF DISCHARGEABILITY, 11 U.S.C. § 523(a)(4)

117.    Plaintiff incorporates by this reference all statements and allegations contained in paragraphs 1 through 116 as though more fully set forth in this Claim for Relief.

118.    McM was insolvent no later than January 1, 2015.

119.    McMartin Jr., as the sole director of McM, owed fiduciary duties to McM's creditors, including BMO, once McM became insolvent.

120.    McMartin Jr. violated his fiduciary duties to McM's creditors, including BMO.

121.    BMO entrusted its collateral to McM, and McMartin Jr. fraudulently misappropriated BMO's collateral for uses other than for which it was entrusted, including, without limitation, for McMartin Jr.'s personal use.

122.    McMartin Jr. wrongfully took and carried away BMO's property with the intent to convert such property to his use, without BMO's consent.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against McMartin Jr., determining that the claims held by Plaintiff against McMartin Jr. are excepted from McMartin Jr.'s discharge under the provisions of 11 U.S.C. § 523(a)(4), for Plaintiff's costs, including reasonable attorneys' fees, as provided by law and/or agreement, and for such other and further relief as the Court deems appropriate.

## FOURTH CLAIM FOR RELIEF
## DETERMINATION OF DISCHARGEABILITY, 11 U.S.C. § 523(a)(6))

123.    Plaintiff incorporates by this reference all statements and allegations contained in paragraphs 1 through 122 as though more fully set forth in this Claim for Relief.

124.    BMO had a lawful right to receive and possess the assets in which McM and McMartin Jr. granted security interests to BMO.

125.    McMartin Jr. wrongfully converted BMO's collateral, including the funds in the Second Ramsey Account, the proceeds of the livestock sale in January 2017, and the A&L Lease rent payments, by interfering with BMO's right to receive and possess the collateral, including, without limitation, by asserting dominion over the collateral for his own benefit.

126.    McMartin Jr.'s actions in converting BMO's collateral were intentional, willful and malicious.

127.    McMartin Jr.'s actions in converting BMO's collateral inflicted a willful injury on BMO.

128.    McMartin Jr.'s actions in converting BMO's collateral inflicted a malicious injury on BMO in that McMartin Jr. targeted BMO.

129.    McMartin Jr. knew that his conversion of BMO's collateral was certain, or almost certain, to cause BMO harm.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against McMartin Jr., determining that the claims held by Plaintiff against McMartin Jr. are excepted from McMartin Jr.'s discharge under the provisions of 11 U.S.C. § 523(a)(6), for Plaintiff's costs, including reasonable attorneys' fees, as provided by law and/or agreement, and for such other and further relief as the Court deems appropriate.

Respectfully submitted,

BMO HARRIS BANK N.A.

By: /s/  Michael T. Benz
One of Its Attorneys

David T.B. Audley
Michael T. Benz
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, IL  60603-4080
Phone: 312.845.3000
Fax: 312.516.3971
audley@chapman.com
benz@chapman.com

Attorneys for BMO Harris Bank N.A.

Douglas W. Murch
CONMY FESTE LTD.
406 Main Avenue, Suite 200
Fargo, ND  58108
Phone: 701.353.0454
Fax: 701.293.3133
dmurch@conmylaw.com

Co-Counsel for BMO Harris Bank N.A