## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>Ronald G. McMartin, Jr.,<br><br>Debtor. | Bankruptcy No. 17-30558<br>Chapter 7 |
| BMO Harris Bank N.A.,<br><br>Plaintiff,<br><br>vs.<br><br>Ronald G. McMartin, Jr.,<br><br>Defendant. | Adversary No. 18-7022 |

## MEMORANDUM AND ORDER

### I.   INTRODUCTION

Plaintiff BMO Harris Bank N.A. filed a Complaint seeking a denial of

Debtor/Defendant Ronald G. McMartin, Jr.'s discharge under 11 U.S.C. § 523(a)(2)(B).[1]

Doc. 1.  Specifically, BMO alleges that Debtor, the president and sole shareholder of

McM, Inc., made materially false written statements to BMO about McM's financial

condition to induce BMO to loan McM money.  Id.  It further alleges Debtor made the

statements knowing they were false and intending to deceive BMO, and BMO relied on

---

[1] In its Complaint, BMO also sought a denial of Debtor's discharge under sections 523(a)(2)(A), (a)(4) and (a)(6).  Doc. 1.  The Court dismissed BMO's claims under section 523(a)(2)(A) and (a)(4) on August 2, 2018.  Doc. 15.  BMO waived its right to pursue its claim under section 523(a)(6) at trial, and it did not object to dismissal of this claim.

the statements.  Id.  Debtor filed an Answer, denying the allegations.  Doc. 18.  For the

following reasons, the Court finds in favor of Debtor and dismisses the Complaint.

## II.    FINDINGS OF FACT

### A.    Background – Debtor and McM

Debtor's long history with agriculture began in 1985 when he farmed 200 acres of

land.  Over the years, Debtor's farming operation grew as opportunities to farm more

land arose.  Debtor operated his farming business as an individual until 1995 when he

formed McM, Inc.  As the president, sole shareholder and sole director of McM, Debtor

expanded its farming operation, producing a variety of crops on nearly 59,000 acres in

2012 and 2013.  McM's annual gross income grew from $16.7 million in 2009 to a high

of $41.4 million in 2013, but its profits never exceeded the $3,544,778 realized at the

end of 2012 when commodity prices were high.[2]  McM suffered net losses in excess of

$4 million in both 2014 and 2015.  McM downsized dramatically in 2016 and petitioned

for bankruptcy relief in 2017.

### B.    Debtor's and McM's Accounting Procedures and Office Personnel

In his early years as a farmer, Debtor used an informal bookkeeping system

based on his check ledger.  McM's accounting became more complex as the size of its

farming operation grew.  Consequently, Debtor outsourced McM's accounting to a

certified public accountant (CPA) who worked with Farm Credit Services (FCS), McM's

lender.  Debtor submitted his bank statements to FCS, and FCS's employee(s) input the

data into its accounting software.  Debtor never discussed the functionality of the

---

[2] McM's financial statements show its net income for 2009, 2010, 2011 and 2013
ranged between $1.8 million and $2.4 million.

software with FCS, but FCS informed him it prepared his financial statements using a cash basis method of accounting.

Several years after he incorporated McM, Debtor switched McM's lender, and McM began borrowing from Bremer Bank. Debtor also transferred McM's accounting to a new accountant, who entered and processed McM's financial data. Like FCS's accountant, the new accountant prepared McM's financial statements using cash basis accounting.

After two years with Bremer Bank, Debtor transferred McM's borrowing relationship to Ramsey National Bank. Ramsey National Bank required McM to submit annual financial statements using cash basis accounting. McM continued to work with the same accountant for two more years after it transferred its business to Ramsey National Bank, and then Debtor transferred McM's business to another accountant. The new accountant also prepared McM's financial statements using cash basis accounting.

In the early 2000s, McM transferred its accounting business to Mortenson & Rygh. Mortenson & Rygh used QuickBooks and encouraged McM to use this software in-house, but McM did not begin using QuickBooks until 2009 or 2010 when McM became "big enough" to hire office staff. At that time, McM hired Heidi Beck to "handle some ancillary accounting in-house and save McM money by not having to pay an outside accountant to do the bookkeeping."

Mortenson & Rygh accountants helped McM, presumably through Beck,[3] transfer its financial data to QuickBooks. McM used QuickBooks for payroll, writing checks and

_____

[3] According to Debtor, he did not assist with setting up QuickBooks because he did not know what information the lender or accountants needed.

depositing money, but Mortenson & Rygh continued to prepare McM's financial statements.  Debtor granted Mortenson & Rygh access to McM's QuickBooks system, allowing its accountants to review data without the assistance of an McM employee.

In 2011, McM switched lenders again, transferring its borrowing relationship to Rabo AgriFinance.  Like Ramsey National Bank, Rabo required McM to submit annual financial statements using cash basis accounting.

As discussed in more detail below, McM switched lenders in 2012, this time to BMO.  Unlike McM's former lenders, BMO required borrowers to provide financial statements using accrual basis accounting.  The parties dispute whether BMO communicated this requirement to Debtor.

In August or September 2013, Beck left McM, and Melissa Gauthier assumed McM's office manager and bookkeeper responsibilities.[4]  Gauthier and a co-worker divided Beck's duties.  Gauthier assumed responsibility for processing accounts payable and accounts receivable using QuickBooks.  Gauthier also tracked McM's land lease payments, received and deposited checks, answered the telephone, and generally helped with paperwork.  According to Gauthier, Beck trained Gauthier for a few days in the two weeks before Beck left McM,[5] and Gauthier continued to use Beck's

---

[4] McM hired Melissa Gauthier as an administrative assistant in December 2012. Prior to working for McM, Gauthier earned a pharmacy technician degree and worked at a pharmacy for 10 years.  After that, she worked for several years at a hospital, which eventually promoted her to the director of human resources, accounts payable and payroll.  Gauthier is not an accountant.

[5] Gauthier explained that she did not know much about Beck's work before Gauthier transitioned to the job because "[Beck] was pretty tight with her information," and they also worked different schedules.  D-244 at 33–34.  In addition, Beck and Gauthier worked at different locations.  As a consequence, Gauthier did not see Beck very often during the time they worked together.

practices and procedures after Beck left.  Although Debtor was Gauthier's supervisor, he did not provide any training to Gauthier, but he answered any questions she asked.

According to Debtor, he did not tell McM's office staff how to do their jobs because he assumed they were receiving directions from the accountants.  Although Debtor prioritized payments to local creditors and landowners when funds ran low, Debtor asserted he never told his staff what data to include or not to include in QuickBooks or in the general ledger.

Both parties' claims and defenses rely, in part, on the method McM used to record its debts to input suppliers.  McM purchased crop input supplies, including seed, chemical and fertilizer from several suppliers including J.R. Simplot Company, Johnson Potato Company, Inc., Crop Production Services, Inc. (CPS) and Columbia Grain, Inc.  During the years when BMO served as McM's lender (2012–2016), Debtor negotiated the terms of McM's agreements with all its suppliers.  McM submitted its needs to the suppliers and entertained their bids, including terms related to pricing and payment.  McM used these negotiations to realize the most competitive prices and to ensure suppliers would not file crop liens.  Debtor explained that it was important to him to secure the suppliers' agreement to refrain from filing liens because he was loyal to BMO and would not have agreed to terms that might have jeopardized BMO's lien priority.

Gauthier described McM's process for paying McM's debts for seed, chemical, fertilizer and other supplies.  McM typically received statements from suppliers at the end of each year (December) for inputs McM used during the previous crop season.  Whenever McM received a statement from an input supplier, Gauthier placed it on a stack of bills she kept on her credenza or in a file cabinet.  She did not enter data from

the invoices in QuickBooks when McM received them; she entered the invoices when she paid them or recorded them in accounts payable at the end of the quarter in which the bills were due, typically in March of the following year.  D-244 at 29–30.

Gauthier could not say who established this process, but it was the process in place when she transitioned to office manager in the fall of 2013.  She reviewed the history of McM's payments to these suppliers in QuickBooks, and McM had always paid them in March.  Consequently, she continued to do so until she stopped working full-time for McM in late July 2016.  Debtor confirmed that McM reported expenses when they became due under the cash basis accounting method McM used.

### C.    BMO and McM – The Early Years

#### 1.    2012

In early 2012, Gary Sloan, a loan officer and senior vice president at BMO, contacted Debtor.  According to Debtor, Sloan pursued large agricultural "credits"[6] and told Debtor that BMO recognized McM's potential to further expand its farming operation.  That spring, Sloan visited McM's farm to observe potato planting and to discuss McM's crop diversity and credit needs with Debtor.[7]  Although Debtor was satisfied with McM's lending relationship with Rabo, BMO offered McM a better interest rate.  Consequently, McM submitted financial information necessary for the loan application process, including its 2009, 2010 and 2011 financial statements.

---

[6] McM was twice the size of any other "cropping" operation lending relationship Sloan had ever managed, but he claimed that he managed other agricultural loans similar in amount to McM's loans.

[7] After this visit, Debtor and Sloan met "sporadically," approximately three times per year, at locations other than McM's farm.

In considering whether to recommend loans to borrowers like McM, BMO loan officers and managers are guided by BMO policy. BMO's credit policy provides: "Generally, business credits of $2,000,000 or more require annual CPA audits or CPA reviews, especially if Bank's credit is dependent on receivable and inventory valuations." D-135 at 37. BMO's policy describes audited, reviewed and compiled financial statements and when each should be obtained:

> Audited statements become important as the size and risk of the credit increase. In many cases, both the customer and the Bank are best served when the customer's records are audited annually. A CPA's knowledge of cost analysis and controls, pensions, profit sharing plans, and income taxes can be valuable to the customer. In determining whether or not to require audited statements, the following factors should be considered:
>
> - The Bank's knowledge of the customer
> - The financial strength of the customer
> - The reliability of the customer's accounting/reporting system
> - The quality and quantity of the collateral
> - The terms and conditions of the loans
>
> Reviewed statements are acceptable for many businesses, provided the customer's underlying accounting and reporting system is considered reliable. For companies facing "going concern" issues, it should be noted, the accountant's review report is not required to be qualified for, or disclose, the "going concern" problem, provided the footnotes include some disclosure of the issue.
>
> Compiled statements are better than company-prepared statements, but they should only be accepted if the Bank is comfortable with the customer's accounting system (based on experience, Account Officer visitation review procedures, commercial audits, etc.). They are considerably less reliable than audits or reviews since the statements are not subject to testing or review procedures. The outside accountant's role is merely to prepare a statement, generally without footnotes, from internal records. Accordingly, if underlying accounting systems are not reliable, a compilation may not detect, or disclose, financial irregularities or concerns. ("Going concern" issues are not required to be presented in either the accountant's compilation report or footnotes.) In view of the limited role of the outside accountant in a compilation, and inherent reliance on the underlying accounting system, the Bank should consider requiring the signature and certification of a company officer on compiled statements.

7

D-135 at 37.

For McM's year-end (YE) 2009, Mortenson & Rygh prepared compiled financial statements.  In its cover letter to the 2009 financial statements, Mortenson & Rygh explained that it prepared the financial statements according to the requirements of Ramsey National Bank, not generally accepted accounting principles.  It clarified, however, that it prepared the income statement "on the accrual basis according to generally accepted accounting principles."  D-121.

Similar to 2009, Mortenson & Rygh prepared compiled financial statements for McM's YE 2010.  In its cover letter to the financial statements, Mortenson & Rygh stated in relevant part:

> A compilation is limited to presenting in the form of financial statements, information that is a representation of management.  We have not audited or reviewed the accompanying financial statements and accordingly, do not express an opinion or any other form of assurance on them.  However, we did become aware of a departure from generally accepted accounting principles that is described in the following paragraph.

> Generally accepted accounting principles require that adequate disclosure be made of all pertinent information.  The accompanying note disclosures do not include substantially all disclosures required by generally accepted accounting principles.  If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the company's financial position, results of operations, and cash flows.  Accordingly, these financial statements are not designed for those who are not informed about such matters[.]

D-122 at 3.

For McM's YE 2011 financial statements, Mortenson & Rygh prepared reviewed statements.  In its cover letter, Mortenson & Rygh explained:

> A review includes primarily applying analytical procedures to management's financial data and making inquiries of Company management.  A review is substantially less in scope than an audit, the objective of which is the

expression of an opinion regarding the financial statements as a whole. Accordingly, we do not express such an opinion.

D-123 at 3.  Although a reviewed statement involves additional work such as testing

information, Sloan did not ask Mortenson & Rygh whether it tested McM's financial data

or what tasks it performed to test the data.  In fact, Sloan could not describe how

additional testing assures the accuracy of information, and he had no idea whether the

testing verified the accuracy of the information in the financial statements.  He claims

that he relied on the accountants to provide financial statements, and he was assured of

the accuracy of the information in the financial statements despite the disclaimers in the

cover letter because the accountants prepared the statements in accordance with

generally accepted accounting principles (GAAP).[8]

BMO did not require McM to submit an audited financial statement in connection

with the loan application process.  When asked why BMO did not require audited

financial statements, Sloan responded that BMO considered the credit factors and

decided that the financial information McM supplied, which was in accordance with

GAAP, was all that was required.[9]

---

[8] Contrary to Sloan's understanding, Mark Larson, a certified public accountant (CPA) and certified forensic accountant who testified as an expert witness at trial, explained that financial statements prepared consistent with generally accepted accounting principles (GAAP) provide no verification of the accuracy of the underlying financial data.

[9] Fillmore Enger, an expert witness with considerable banking experience, opined that reasonable commercial lenders do not rely on compiled or reviewed financial statements for loans like those BMO made to McM because "the credit – it's seasonal, it's cyclical, it's commodity-driven, and . . . weather . . . and you can't afford a mistake on documentation or on your financial numbers.  So you need as much integrity to those numbers as you can realize."  Further, reviewed financial statements provide "no assurances, as stated by the accountant, that they are accurate."  Based on his experience and his review of BMO's policy, Enger maintained a reasonable commercial lender would have required audited financial statements for loans like those between

In July 2012, BMO hired Eide Bailly, a regional certified public accounting and business advisory firm, in connection with BMO's analysis of whether to extend credit to McM. Mary Jo Richard, a CPA and partner at Eide Bailly,[10] provided the consulting. The consulting engagement required Richard to perform a list of written procedures specified by BMO.

Shortly after BMO retained Eide Bailly, Richard visited McM's farm to discuss the specified procedures with Debtor and Beck. According to Richard, she "went through the checklist of specified procedures and asked for backup for certain things that were on the schedule . . . of the procedures requested by BMO" with Debtor. BMO-313 at 18.

Based on her review, Richard discerned that McM used a cash basis method of accounting, meaning it did not record payables until they were paid, and it did not record revenue until it received cash from the sale of crops. According to Richard, she discussed the distinction between cash and accrual accounting with Debtor and told him

_____

BMO and McM—at the inception of the lending relationship and each subsequent year—because only audited financial statements assure accuracy.

Juanita Schwartzkopf, a CPA and certified fraud examiner, testified that, in her experience, reasonable commercial lenders rely on reviewed financial statements without verifying the accountants' work because accountants apply analytical procedures that assure the veracity of the financial statements. She maintains it is appropriate for creditors to rely on reviewed statements, even for loans totaling approximately $25 million. Schwartzkopf reviewed BMO's policy in the context of the July 2012 loan and opined that it did not require an audited financial statement. She emphasized that BMO's policy granted BMO the ability to make the decision on the quality of the financial statement it required. She acknowledged the importance of a lender understanding the quality of the financial information it receives from a borrower in making that decision, however.

[10] Richard served clients in the agricultural industry for 33 years, including both corporate and personal farming operations.

that BMO required McM to convert to accrual basis accounting.[11]  However, Richard did

not recall the specifics of this conversation with Debtor or whether she discussed the

need for McM to prepare year-end financial statements using accrual basis accounting.

Richard also did not recall Debtor affirmatively acknowledging his understanding of the

required change.  Richard did not discuss the need to use accrual basis accounting with

Beck.

 Debtor asserted that he never had a discussion with Richard or anyone from

Eide Bailly during which someone told him McM must use accrual basis accounting.

According to Debtor, McM never changed how it kept its books from McM's formation in

1995 until its bankruptcy in 2016.

 Shortly after Richard's farm visit, she prepared a report for BMO.  In her report,

Richard wrote: "McM, Inc. currently uses a cash basis of accounting for interim financial

statements.  We discussed the procedures that will be put in place to prepare accrual

basis financial statements as of and for the 9 months ended September 30, 2012 and

for each subsequent quarter end prior to sending financial statements to the bank."

BMO-205 at 2.  BMO acknowledged learning that McM used cash basis accounting in a

BMO document prepared after receiving Richard's report.  D-155; D-149.

 Richard did not recall any follow-up conversation with anyone at BMO after she

delivered her report.  After completing its consultation engagement for BMO in 2012,

---

[11] Although Richard generally recalled discussing with Debtor how McM
purchased input supplies, she did not recall the discussion specifically.  Instead, she
explained that "any discussion would have been around accrual-based accounting and
the requirement to record the payables when they were payable."  BMO-313 at 36.

Eide Bailly had no involvement with McM until it began performing McM's accounting work in late 2014.  See infra.

Based on Richard's report, Sloan understood that Eide Bailly told Debtor that BMO required McM to prepare its financial statements using accrual basis accounting. Sloan did not ask anyone with Eide Bailly who he or she spoke to at McM or what steps Eide Bailly took to ensure McM could transition to accrual basis accounting.

Other than retaining the services of a business consultant, BMO took no steps to ensure the 2009, 2010 and 2011 financial statements it reviewed included accurate and reliable information.  BMO did not contact McM's vendors, customers, accountants or prior lenders.[12]  According to Sloan, BMO hired Eide Bailly to verify that McM's accounting and reporting systems were reliable.[13]  Likewise, instead of reviewing McM's procedures personally, BMO hired Eide Bailly.[14]

---

[12] According to Sloan, contacting a prospective borrower's current lender is not customary (he also said it would be "highly unusual because it never happens").  The same is true for contacting a prospective borrower's vendors.  Sloan acknowledged, however, that nothing precluded BMO from contacting McM's vendors.  In addressing this testimony, Enger opined: "[BMO] was the equity in this transaction.  They were the senior debt in this transaction.  And they were entitled—they could get a waiver from [Debtor].  The last thing I'd worry about is being sued by a vendor when you're talking about a $45 million loan."

[13] Sloan did not know when McM began using QuickBooks, who set up McM's accounting system or who administered it.  Although he acknowledged that this information "could be" important in judging the reliability of McM's accounting system, and he did not know whether Eide Bailly investigated these issues, he relied on Eide Bailly without knowing or asking about these details.

[14] Enger opined that Richard's field examination would not have given a reasonable commercial lender a basis to believe that McM's accounting and reporting system was reliable because it involved only "a limited field audit and had nothing to do with the balance sheet or income statement."  According to Enger, the field examination was insufficient to support a credit decision.

In analyzing McM's financial information and Richard's report, Sloan considered other credit factors, including industry conditions and McM's repayment capacity, capital position, management and collateral, in deciding whether to recommend that BMO loan money to McM.  In his review of McM's management, Sloan talked to Debtor and looked at McM's operation—by reviewing McM's financial information.  In considering McM's collateral, Sloan looked only at the financial statements.  He "would have" "verified" the information on the 2009-2011 financial statements by requesting information from Debtor about McM's various assets.  Sloan did not specifically recall asking Debtor any questions, however.  No one from either Eide Bailly or BMO appraised McM's property. Instead, according to Sloan, BMO relied on the asset values provided by McM.  Sloan analyzed McM's collateral value by considering the financial information from McM and Eide Bailly and comparing it to the sum of the proposed loan commitment.  He concluded that the value of McM's collateral was sufficient to repay the loan, and he recommended BMO make a loan to McM.

BMO and McM entered into a Master Loan Agreement dated July 31, 2012, Debtor signed a security agreement and guaranty, and BMO extended credit to McM. Doc. 111.  BMO agreed to extend McM $25,000,000 for a revolving line of credit to finance crop input costs and working capital fluctuations in McM's farming operations. The agreement required McM to provide financial statements and information conforming with GAAP and to comply with specific financial covenants.  BMO-201. Consistent with this agreement, BMO's policy required borrowers to prepare financial statements using accrual accounting.

Mortenson & Rygh prepared McM's third quarter (3Q) and YE 2012 reviewed financial statements, which were McM's first financial statements after BMO became McM's lender and after Eide Bailly reportedly worked with McM to transition to accrual basis accounting.[15]  BMO's credit policy specified that it may accept reviewed statements if the borrower's underlying accounting and reporting system "is considered reliable."  Aside from the information it learned from Eide Bailly in 2012, BMO did not obtain any new information about McM's accounting and reporting system in 2013. The loan covenants required McM to certify the truth and accuracy of the financial statements, but BMO apparently did not require a certification, and Debtor did not provide one.

McM's 3Q 2012 financial statements listed accounts payable totaling $9,847,158. D-125.  The YE 2012 financial statements showed that McM's accounts payable obligations dropped to $214,945.  D-124.  Sloan acknowledged that changing from cash to accrual accounting could make a significant difference in McM's financial statements. He reviewed McM's financial statements after Eide Bailly's consultation engagement,

---

[15] In its cover letter to McM's YE 2012 reviewed financial statements, Mortenson & Rygh represented that it was not aware of any material modifications that should be made to the YE 2012 financial statements to conform to GAAP.  In notes included with the financial statements, Mortenson & Rygh accountants stated that they used accrual basis accounting to prepare the statements.  According to Debtor, he generally did not read the notes in financial statements and did not read this one.  The accountant(s) who prepared the statements expressed no opinion regarding the accuracy of the information contained in them.

however, and claimed he did not notice any significant difference, even though McM's

previous financial statements show accounts payable did not exceed $300,000.[16]

Sloan observed that McM's accounts payable decreased by more than $9 million

between the 3Q 2012 and YE 2012 financial statements, but he reasoned that the

reduction would have been consistent with McM paying accounts payable during the

---

[16] McM's accounts payable history reveals significant variations:

| Financial Statements | Accounts Payable |
|---|---|
| YE 2009 | $     58,344 (D-121 at 4) |
| YE 2010 | $   277,343 (D-122 at 4) |
| YE 2011 | $   187,183 (D-123 at 4) |
| 3Q 2012 | $9,847,158 (D-125 at 4) |
| YE 2012 | $   214,945 (D-124 at 4; BMO-206) |
| 1Q 2013 | $     19,388 (D-127 at 5) |
| 2Q 2013 | $     32,626 (Id. at 12) |
| 3Q 2013 | $   308,848 (Id. at 19) |
| YE 2013 | $   334,259 (D-126 at 4) |
| 2Q 2014 | $1,489,195 (D-129 at 11) |
| 3Q 2014 | $1,317,059 (Id. at 5) |
| YE 2014 | $   215,798 (D-128 at 6) |
| 1Q 2015 | $   475,964 (D-131 at 6) |
| 3Q 2015 | $   324,013 (BMO-232 at 7) |
| YE 2015 | $     24,660 (D-130 at 7; D-132 at 7) |
| 1Q 2016 | $   123,873 (D-134 at 6) |

Sloan did not verify the accounts payable total on any of McM's financial statements.
He was not concerned that McM returned to using cash basis accounting, and he did
not make any inquiries about it.

The expert witnesses who testified at trial opined about the unusual nature of
McM's accounts payable. Schwartzkopf observed that McM's accounts payable totals
were small given McM's total liabilities. Enger opined that the fluctuations in McM's
accounts payable signaled erroneous reporting. Larson explained that, as businesses
grow, there is typically a direct relationship between business revenue and accounts
payable. As revenue increases, accounts payable typically increase. Enger and Larson
opined that the lack of a correlation between McM's accounts payable and revenue
should have prompted BMO to investigate the underlying data. Larson acknowledged,
however, that an accountant is "front line" in noticing fluctuations in accounts payable.

15

fourth quarter of the year after it received crop sale proceeds.  He insisted this was a reasonable assumption, but he did nothing to verify his assumption.  He did not ask about the timing of payments to input suppliers, and he did not ask whether McM paid the 15 vendors to which McM owed the most money.  He was not sure whether the $9 million reduction in accounts payable was consistent with McM's cash flow budget.[17] Likewise, Sloan did not confirm that McM deposited its crop proceeds in its account with BMO, resulting in a corresponding reduction of its revolving line of credit.  Rather, Sloan relied on the accuracy of McM's accounts payable listed in the YE 2012 reviewed financial statements, which accountants purportedly prepared on an accrual basis consistent with GAAP.

Sloan testified he relied on the YE 2012 financial statements even though no one from BMO verified the information in them.  He explained that it is customary to rely on financial statements provided by a borrower.  When he receives a financial statement from a borrower that was prepared by an outside accounting firm, he does not consider it his obligation to "redo all the work that the accountant has done."  Rather, he maintained it is customary to treat the work product of an outside accounting firm as reliable.  Sloan explained that he trusts accountants but asks questions as necessary to understand information.  Sloan did not recall asking McM's accountants any questions

---

[17] McM provided periodic cash flow budgets to BMO at the time.  Sloan did not remember advising McM that cash flow budgets should reflect only expenses incurred for the current year.  Sloan was not aware whether the expenses for inputs on the cash flow statements were incurred the current year or the past year.  He simply assumed that the accounts payable figures reflected current year expenses because accountants prepared the YE 2012 reviewed financial statements on an accrual basis, and the statements showed minimal accounts payable.

or attempting to verify the information in the financial statements to gain an

understanding of the information in them.  According to Sloan, he and BMO relied on

the 2012 financial statements and believed they were prepared on an accrual basis.

### 2.     2013

Sloan participated in an analysis of McM's collateral value in early 2013.

According to Sloan, his analysis entailed reviewing McM's financial information

documenting the value of its collateral.  Sloan concluded that the value of McM's

collateral supported an increased loan amount, and he recommended that BMO

approve a larger loan to McM for 2013.

During a BMO internal email exchange on May 14, 2013, a regional senior credit

officer expressed concern about the quality of financial information BMO received from

McM.  He noted:

> The financial statements are a big issue for me.  We apparently have one
> year of reviewed statements from a small CPA firm.  Although I am not
> challenging the accuracy, in my opinion it is not a strong reviewed
> statement.  For example, neither the balance sheet or footnotes itemize
> gross fixed assets, less accumulated depreciation.  The quality of financial
> reporting is a significant hurdle to approving additional exposure for this
> borrower.

D-169; D-170.  Despite this concern, BMO approved a loan increase.

BMO and McM executed a First Amendment to Master Loan Agreement effective

May 14, 2013.  BMO increased its loan to McM from $25 million to $31 million and

added an additional $1.5 million hedging line of credit.

Mortenson & Rygh prepared McM's YE 2013 financial statements.  Again, the

accountants included a note stating that they prepared the statements using accrual

basis accounting.  Similar to previous reports, Mortenson & Rygh represented that it

was not aware of any material modifications that should be made to the 2013 financial statements for them to conform with GAAP.  Mortenson & Rygh also expressed no opinion regarding the accuracy of the information in the statements.  Debtor did not provide a certification of accuracy.

Sloan reviewed McM's YE 2013 financial statements and believed they were prepared on an accrual basis, claiming he had no information to the contrary.  Sloan had no concerns with McM's loan in 2013.

### 3.    2014

McM sought another loan from BMO in 2014.  In considering this request, Sloan and others at BMO analyzed McM's YE 2013 reviewed financial statements and McM's 1Q 2014 financial statements.[18]  Sloan was not aware of any additional information BMO obtained pertaining to McM after the 2013 loan and before the 2014 loan.

BMO and McM executed a Second Amendment to Master Loan Agreement effective April 30, 2014, and Debtor signed related notes, a security agreement and a guaranty acknowledgment.  In this agreement, BMO increased McM's loan to $36 million, but McM agreed to reduce the loan balance to $32 million by September 30, 2014.  BMO also increased McM's hedging line of credit from $1.5 million to $4 million. McM complied with the requirement to reduce the loan balance to $32 million by September 30, 2014.

---

[18]  Mortenson & Rygh also prepared McM's 1Q, 2Q and 3Q 2014 financial statements.  In the quarterly financial statements, Mortenson & Rygh expressed no opinion about the accuracy of the information in the statement and provided no assurance about whether the financial statements were prepared in accordance with GAAP.  Debtor did not provide a certification of accuracy.  At trial, Sloan did not recall whether he or anyone from BMO took any action to verify the accuracy of the information in these quarterly financial statements.

According to Sloan, a general downturn in the farm economy in 2014 led to

McM—and many other farming operations—realizing a loss that year.  After McM's

"fabulous" year in 2012 and "good" year in 2013, inflation caused land rents to increase

dramatically, according to Debtor.  McM entered into land contracts with three- to five-

year terms during this period of inflated rents.  Meanwhile, commodity prices fell, and

McM's revenues decreased.  Despite these challenges, McM remained current on its

obligations to BMO in 2012, 2013 and 2014.

### D.      Eide Bailly Assumes McM's Accounting

In the fall of 2014, BMO recommended that McM move to a larger accounting

firm to provide McM's operation more expertise.  Debtor contacted Richard, and Eide

Bailly agreed to perform McM's accounting work, replacing Mortenson & Rygh.

Richard did not recall any conversations with anyone from McM in October,

November or December 2014 about whether McM was recording income and expenses

consistent with accrual basis accounting.  In fact, she testified that she could not recall

any specific conversation with Debtor about anything between 2014 and June 2016.

Trudy Wilmer, another Eide Bailly accountant, primarily performed the "detailed

work," which included requesting a list of accounts payable and accounts receivable

from McM to ensure that the list was consistent with the general ledger in QuickBooks.

As with Mortenson & Rygh, McM granted Eide Bailly full access to McM's accounting

system.  McM provided Eide Bailly all the information it requested.

According to Gauthier, her involvement with Eide Bailly mostly related to

payables, and Debtor handled receivables and inventory.  She testified that Eide Bailly

instructed her how to prepare the information the accountants needed.  When asked

whether Eide Bailly instructed her how to handle payables for the financial reporting and

what needed to be reported to Eide Bailly, Gauthier testified, "I think so.  I mean, I just continued to do things as I had always been doing them."  D-244 at 96.  According to Gauthier, she believed she was doing a good job and did not intentionally do anything wrong.  She thought she followed Eide Bailly's requests.  Eide Bailly never complained about her work or expressed any concerns regarding accrual basis accounting.

Gauthier testified that she "kind of" understood the difference between accrual and cash basis accounting.  D-244 at 92.  She articulated her understanding as:

> Well, how they, how they would do it is—or how, or how they would make me do it is, these bills came in and we're, so we're getting all these expenses, we're accruing all these expenses, but we had no income.  So then the cash would come in later, as—we, when we could harvest.  So we'd have all the—you know, we're accruing all these expenses and then we'd have the revenue come in later.

Id. at 92–93.  When asked whether Eide Bailly explained to her that McM's financial statements were to be prepared as accrual basis financial statements, she said, "I guess I'm not sure," but she did not recall Eide Bailly discussing the requirement to convert from a cash basis accounting system to an accrual basis system.  Id. at 96.

Debtor never talked to Gauthier about how accounts payable should be posted in QuickBooks.  Similarly, Debtor never instructed his staff not to send any information to BMO or Eide Bailly.  He never instructed his staff to send incomplete or inaccurate information to BMO or Eide Bailly or to misrepresent or conceal information.  Debtor maintains McM fairly and accurately provided information.

Consistent with Debtor's testimony, Gauthier did not recall any meetings or conversations with Debtor where he told her how to prepare financial reports.  She did not recall Debtor ever telling her not to send any information or to conceal any information from either BMO or Eide Bailly.

Gauthier also testified that she did not recall Debtor ever "going into" the QuickBooks system while she worked at McM.  Likewise, Richard testified that Debtor was not involved in entering data into the books.  Richard was not aware of any evidence that Debtor sought to hide information from Eide Bailly or that he altered McM's bookkeeping system to attempt to conceal information from BMO.

The first financial statements Eide Bailly prepared for McM were combined reviewed YE 2014 financial statements.  Eide Bailly purportedly prepared the financial statements using accrual basis accounting.  It obtained the information in the financial statements from McM's books and records.

Sloan received and reviewed McM's YE 2014 financial statements, which showed a net loss of $4,503,547.  BMO-256.  As with the previous statements prepared by Mortenson & Rygh, Eide Bailly included a cover letter indicating it was not aware of any modifications necessary to conform with GAAP.  Eide Bailly also stated that it did not express an opinion regarding the combined financial statements as a whole.  Sloan understood that McM used accrual accounting, and he did not have any information to the contrary.  According to Sloan, he relied on the accuracy of the financial statements. He thought he had some discussions about the financial information with Eide Bailly but did not have any specific recollection of these discussions.  Sloan could not recall any new information related to the reliability of the financial statements prior to the 2015 loan application process.

BMO and McM executed a Third Amendment to Master Loan Agreement effective April 13, 2015.  Under this agreement, BMO extended an additional $8 million to McM, and McM committed to reducing the loan balance to $4 million by August 31,

2015, with a maturity date of October 31, 2015.  BMO-210.  BMO also reduced McM's

hedging line of credit to $1.5 million.

### E.      BMO's Special Assets Management Unit Becomes Involved

BMO assigned Laurie Mueller,[19] a senior relationship manager with BMO's

Special Assets Management Unit (SAMU), to McM's account in April 2015 at the time of

the Third Amendment.  SAMU provides "shadow support" to loan officers who manage

"credits" with financial challenges.  SAMU provides additional oversight of the

information provided by a client and internal guidance regarding compliance with loan

covenants.  When a relationship manager from SAMU is assigned to an account, he or

she becomes a part of the credit approval process.  BMO assigned SAMU to McM's

account because McM "was showing some financial weaknesses that needed to be

addressed."  Specifically, McM's YE 2014 financial statements showed a "significant

loss and deterioration in the financial condition of the operation," according to Mueller.

As a consequence, BMO downgraded McM's risk rating to a lower satisfactory rating

and assigned SAMU to the account.[20]  At the time, Sloan remained the principal loan

---

[19] Mueller has worked for BMO (or its predecessor(s)) for almost 35 years.  She has been involved with agricultural clients since 1997 and has worked exclusively with agricultural clients the last five years.

[20] BMO initially downgraded the risk rating on McM's account to S4 (Satisfactory/4th level), which is the lowest satisfactory risk rating BMO allows, and eventually downgraded McM's account to P2 (Problem/2nd level).  BMO authorizes new loans to P2 accounts only under certain circumstances, including protective advances necessary to protect BMO's collateral and "working with operations that are working through their financial issues that may need a source of capital to be able to continue to operate and generate additional revenues to repay debt," according to Mueller.  A P2 rating indicates that there is material weakness, but based on the information provided to BMO, an action plan to improve the financial condition of a business and to generate revenue to repay debt appears feasible.  In short, P2 loans are intended only as protective advances or to repay existing debt to BMO.

officer and relationship manager for McM.  Mueller reviewed McM's financial information

forwarded to her.[21]  She did not interact directly with McM.

McM failed to make the $4 million loan payment on August 31, 2015, as required

by the 2015 loan agreement, but it satisfied this obligation in mid-September.  Similarly,

McM submitted the additional $4 million payment due on October 31, 2015,

approximately two weeks late.  At the end of 2015, however, McM remained indebted to

BMO only on the loans it received in 2012–2014.

McM's tardy payment in September raised concerns at BMO.  The inconsistency

between McM's projected revenues and its cash flow budget also raised questions.

Consequently, Mueller and SAMU assumed primary responsibility for the loan and the

credit relationship with McM in mid-September 2015.

---

[21] Mueller became familiar with Eide Bailly's "field exam" from 2012 in early 2016.
At some point, she reviewed McM's financial statements from the beginning of BMO's
lending relationship with McM.  Specifically, she looked at McM's YE financial
statements for 2012–2015.  She knew that McM kept its books on a cash basis at one
point and that Eide Bailly reportedly told McM to change to accrual basis accounting,
but she never verified that the change actually occurred.  Debtor never told Mueller
McM was not using accrual accounting.

Although Mueller acknowledged an "immense" difference between cash and
accrual basis accounting, she opined that McM's failure to use accrual accounting
would not necessarily have been obvious, depending on the categories of assets and
liabilities and timing.  If McM had changed from cash to accrual, it would be obvious if it
was done right, she conceded, but she did not recall ever comparing previous financial
documents to see what should have been an obvious change.

After she became more involved with McM's account, Mueller spoke with Eide
Bailly and McM about McM's accounting system.  She learned that Eide Bailly had
access to McM's financial and business records, that McM used QuickBooks and that
Gauthier input the data into QuickBooks.  Mueller knew that Gauthier previously worked
in a business manager role, but Mueller described Gauthier as "not what I would
consider CFO material."  Other than asking Eide Bailly and McM what they did to
complete the financial statements, she did nothing more to investigate McM's
accounting system.

After BMO transferred McM's account to SAMU, Sloan worked with Mueller in a transitionary capacity.  He remained involved with the relationship because of his knowledge of McM's operation, but he had no authority.

### F.    The 2016 Loans

In early 2016, McM sought a $10 million operating loan to farm 38,000 acres of land.  In assessing this credit request, Mueller requested a draft of McM's YE 2015 financial statements.  BMO-236.  She planned to review the draft and discuss it with Debtor and Eide Bailly to address any questions before Eide Bailly finalized the YE 2015 financial statements.  On February 16, 2016, Eide Bailly provided the draft YE 2015 financial statements to Mueller, which showed that McM realized a net loss of $4,783,964 in 2015.[22]  BMO-237.

On February 20, 2016, Mueller sent a status update to the SAMU leadership team regarding McM's financial condition, highlighting McM's loss in 2015.  Mueller also identified six specific loan covenant violations pertaining to McM's tangible net worth, fixed charge coverage ratio, fixed asset expenditures, working capital, real estate lease obligations and other obligations.  BMO-239.  Mueller listed several topics she planned to discuss with Debtor at an upcoming meeting, including a notice of default due to loan covenant violations.  She also planned to tell Debtor that BMO required McM to close its

---

[22] Throughout the years, Debtor received drafts of the financial statements from accountants, but he seldom, if ever, asked them to change anything.  He reviewed the assets acquired and liquidated to make sure they were correct.  He focused his review primarily on assets and income.  He did not focus on liabilities because he assumed the liabilities were correctly reported.

account at Ramsey National Bank (which it primarily used for payroll) and process all payroll through its accounts with BMO.[23]

Debtor, Sloan, Mueller and Wilmer met at Eide Bailly on February 22, 2016. Richard attended the meeting by telephone. McM provided Mueller cash flow projections at the meeting, but they "included non-cash revenues (prepaids) and were not true cash flow projections," according to Mueller. See BMO-241. Mueller was concerned Debtor did not have the expertise to assist with the budget, so she requested Eide Bailly's assistance inputting McM's revenues and expenses into a spreadsheet provided by BMO to create a monthly cash flow budget. Because Eide Bailly had not previously been involved in preparing the cash flow budget, Mueller and the others at the meeting discussed the cash flow budget extensively. BMO wanted to "get an idea of how much cash potentially could be generated to repay the loan request that was under consideration and also pay down the existing debt that we had outstanding at the time."

During the meeting, Mueller also sought to understand how Eide Bailly determined McM's inventory and receivables. According to Mueller, she and Debtor discussed McM's need to "get a handle on" how McM was calculating its potato inventory because of a $2.2 million variance between the potato revenues McM actually received in 2015 (from the 2014 crop) and the net realizable value that Eide Bailly listed on the YE 2014 financial statements. Because of this variance, Mueller was trying to "get a good handle" on whether the crop inventory numbers representing 2015 crops

---

[23] As of September 2015, BMO understood that Debtor used the Ramsey National Bank account for "operating needs." BMO-228.

were accurate. Mueller expected McM to sell the 2015 potato inventory in 2016, and she wanted to ensure the net realizable value calculations were realistic, taking into consideration shrinkage and price disparities—issues that affected the 2014 crop revenues (realized in 2015).

More broadly, SAMU wanted to ensure McM provided a conservative inventory valuation on the YE 2015 financial statements to prevent another "huge write down" of the potato inventory in 2016, which occurred in 2015 and factored into McM's loss. An accurate assessment of the potato inventory was also relevant to the cash flow budget because the potato revenues were necessary to fund some of McM's input and other operating expenses in 2016.

According to Mueller, she advised Debtor that she and Sloan did not think McM's $10 million 2016 operating loan request was feasible, but they thought BMO might fund $8 million of the request. As planned, Mueller also discussed BMO's request that Debtor close the Ramsey National Bank account. She agreed, however, to allow McM to keep the account open to allow employees to cash their paychecks through this account.[24]

Debtor and Eide Bailly worked together to generate a spreadsheet showing McM's crop and cattle inventories as of YE 2015, including potato inventory. They added extra detail for potatoes, categorizing them by grades of potatoes and price and

---

[24] Although BMO prohibited McM from depositing crop proceeds into the Ramsey National Bank account, McM deposited money in the account to honor the payroll checks. Despite his conversation with Mueller or because of it, Debtor insisted McM had BMO's permission to deposit crop proceeds checks in the Ramsey National Bank account to cover payroll many times in 2016.

factored in shrinkage. Following the February 22, 2016, meeting, Eide Bailly provided the spreadsheet to BMO.

In their spreadsheet, Debtor and Eide Bailly based the estimated value of potato inventory on 1,162,311 cwt of total potato production.[25] This figure did not include reductions for shrinkage or seed. After subtracting more than 10 percent of the potato weight to account for shrinkage, deducting 63,000 cwt for seed and reducing the sum by 2015 sales, the estimated weight of potatoes available for sale in 2016 totaled 821,336 cwt.[26] McM estimated the value of this inventory totaled $10,149,741, assuming the potatoes sold for an average price of approximately $12.36/cwt. BMO-274. McM estimated that the value of all its crops and cattle inventories totaled $13,672,974, with potatoes comprising $11,094,741 ($10,149,741 for sale, $945,000 for seed) of this sum. Eide Bailly included the $13,672,974 inventory figure in the YE 2015 financial statements.

---

[25] This estimate is consistent with—although marginally higher than—potato production estimates Debtor provided BMO in September 2015. D-249; BMO-229.

[26] Debtor provided the potato inventory assumptions to Eide Bailly. He explained that he was told to expect a "phenomenal" potato crop based on field samples. In 2015, McM planted its largest potato crop in terms of acreage. Consequently, McM expected a high yield. See D-204. After McM harvested the potato crop in mid-October, McM estimated the value of the potato crop in consultation with Eide Bailly. Specifically, they considered a settlement statement from December 15 and used that profile to project the value of the crop. In valuing the 2015 potato crop, Debtor "tried to be much more accurate" with his projections. Previously, McM determined value based on a price per hundred weight. At the time Debtor estimated the 2015 potato revenues, he thought the best evidence of the quantity of the 2015 crop yield was "what the agriculturists were finding in the fields" combined with the "truck load measurements that we were doing in actual harvest." Debtor reported that McM's potato manager estimated the yield in September 2015 based on the field samples. Although Debtor calculated the 2015 potato inventory in February 2016 after all the potatoes were harvested, Debtor explained that "the production going into storage is never measured by weight."

The day after the meeting, Mueller sent an email to Debtor and the others at the meeting regarding the cash flow budget.  She wrote: "Since this is supposed to be a cash flow budget, not a crop revenue and expense budget, it needs to track and reconcile to actual cash receipts and cash disbursements."  BMO-240.  Mueller sought to confirm this information, so she requested that Debtor answer the following questions: "[D]o the expenses reflect actual expenses that need to be paid with cash, or do they reflect certain amounts that were paid in 2015? ….  Ron, can you review with [Eide Bailly] to refine to solely reflect expected cash receipts and cash disbursements?" Id.

On March 2, 2016, Mueller sent another status update to the SAMU leadership team involved in the 2016 loan decision process.  She reported that McM and Eide Bailly had taken steps to be "more detailed and granular in how that [potato inventory] number was calculated."  She also informed the SAMU team that McM's YE 2014 financial statements reported a net loss before taxes of $5.4 million.  BMO-241.  She noted that McM's potato receipts totaled $2.2 million less than the inventory book value on the YE 2014 financial statements.  Additionally, she informed the team that in its draft YE 2015 financial statements, McM reported a net loss after tax of $4,783,000.

Debtor sent Mueller an email on March 4, 2016, related to crop insurance cost and coverage.  Debtor did not include a message; he simply attached a chart with the heading, "McM Inc 2016 insurance guarantees by crop with per acre premiums."  BMO-243.  The chart itemized the acreage for each specific crop and detailed the extent and cost of insurance coverage for each crop.  The acreage on the chart totaled 38,760.7 acres.

28

On March 9, 2016, Mueller sent another status update to the SAMU leadership team.  In it, Mueller stated that McM owed BMO $33 million at the time, and that BMO could expect to lose "$13 million (maybe more)" if it did not extend credit to McM in 2016 and opted to liquidate McM's assets.  BMO-244.  By comparison, if BMO funded the 2016 operation and McM ceased operations after the 2016 crop year, she projected McM's outstanding debt would total $5.3 million.  As part of her analysis, Mueller explained:

> McM expensed $8 [million] in "prepaids" in 2015 for the 2016 crop which have minimal to no liquidation value if a 2016 crop is not produced.  I can sell the seed inventory, and that is about it.  Realizing a return on the investment spent spreading fertilizer in the fall, making lease payments on necessary equipment and preparing the soil for 2016 crops can only come if the crop is planted.

Id.  The BMO team debated the merits of funding McM's 2016 operation.  One member commented, "Liquidation is very dire ($13 [million] loss or so), so we obviously want to avoid that."  BMO-246.  Regarding the probability of BMO realizing a benefit from another operating loan, Mueller wrote:

> I have confidence in McM owner Ron McMartin as a producer, and have confidence in the CPA team with Eide Bailly.  If Eide wasn't on board I would have a different opinion, as I don't think McM's internal accounting person meets CFO standards.  McM knows the budget/actual reporting is critical as we move forward, and will be monitored extremely closely.

BMO-244.

Eide Bailly prepared the "budget-to-actual" cash flow for February 2016 using cash basis accounting pursuant to BMO's request.  Specifically, Eide Bailly input actual expense and revenue figures it received from Debtor and Gauthier and compared them to the estimated budget.  In its cash flow budget, McM projected cash receipts totaling $49,818,012 and cash disbursements totaling $22,727,225, resulting in a "Net Cash

Inflow" of $27,090,787.  BMO-279.  Eide Bailly provided the budget to Debtor, and he
forwarded it to Mueller on March 13, 2016.  According to Mueller, cash flow was also a
key factor in determining whether to loan McM money in 2016.

The cash flow budget included a section for "Cash Disbursements: 2016 crop
year."  BMO-279.  Mueller understood that the disbursements included only those
expenses necessary to fund McM's operation, including those related to planting,
maintaining and harvesting the 2016 crop.  Debtor testified, however, that he
understood that McM's budget should reflect accounts payable from 2015 that McM
planned to pay in 2016.[27]  He clarified that if the budget had said "Cash Disbursements:
2016 crops" he would have viewed it differently; the disbursements would have been
specific to expenses related to the crops McM raised in 2016.  Although Debtor did not
inform Mueller that the disbursements included accounts payable related to the 2015
crop year, he insisted that he never tried to conceal this fact.

On March 17, 2016, Mueller prepared a memorandum to other SAMU team
members, including Edmund Burke, the managing director of U.S. SAMU (and Mueller's
supervisor's boss).  The purpose of the memorandum was to update the team on the
revised cash flow budget prepared by Eide Bailly, to provide a summary of the total
projected revenues in 2016 and 2017, and to discuss the expenses associated with the
projections.  In the memorandum, Mueller again estimated BMO would suffer a $13–14
million loss if it did not extend credit to McM in 2016.  BMO-248.  Comparatively, she

---

[27] When asked for his understanding of what disbursements were to be included,
Debtor answered, "All crop inputs for the '16 season," meaning the bills that were due in
the crop year.  He explained, "It was cash basis, so as bills were either paid as we
received them in that current month-to-month situation."  Some of these bills "related to
inputs from 2015 that had come due."

estimated BMO would lose $5.89 million if BMO extended McM $10 million in 2016.  On

the same day, Burke forwarded the memorandum to other SAMU members, including

Nadim Hirji, the head of SAMU for Canada and the United States.  BMO-249.

According to Mueller, Hirji was involved at this point based on the risk associated with

the relationship:

> There was significant concern about the financial condition of McM.  The
> loss potential in the event that McM did not continue operating in 2016 and
> the new money request that was on the table which would be highly unusual
> for a credit of this risk profile without having a significant and documented
> rationale to move forward with the loan.

On March 21, 2016, Debtor sent Mueller and Sloan an email with an attached

spreadsheet showing updated 2016 revenue projections by crop as well as revenue

projections from custom hiring and equipment rental.  BMO-250; BMO-251.  According

to the spreadsheet, McM estimated 2016 farm revenue totaling $31,368,852.  BMO-

251.  Of this sum, McM estimated red potatoes would generate $10,975,000 in revenue.

Id.

### 1.    McM's YE 2015 Financial Statements

Debtor sent McM's final YE 2015 financial statements to Mueller and Sloan on

March 23, 2016.[28]  BMO-252.  Consistent with the draft YE 2015 financial statements,

---

[28] As with previous statements it prepared for McM, Eide Bailly purportedly
prepared these "Combined Financial Statements December 31, 2015 and 2014" on an
accrual basis.  In its "Independent Accountant's Review Report" attached to the financial
statements, Eide Bailly represented that the financial statements were prepared using
GAAP, but it did not expressly state that they were prepared using accrual basis
accounting.  BMO-253.  Eide Bailly also clarified: "We have reviewed the information,
however, we have not audited the information and, accordingly, do not express an
opinion on such information."  Id.

Richard could not recall specifically communicating with anyone at McM about
accrual accounting during 2014 or 2015.  Instead, she claims it was "assumed" because

the YE 2015 statements listed investment in future crop totaling $8,234,134[29] and

"inventories" totaling $13,672,974, including $11,094,741 in potato inventory.  BMO-

253.  Eide Bailly also reported that McM owed current liabilities of $33,735,995,

including $32,906,551 to BMO on its operating and hedging line of credit.  The YE 2015

financial statements confirmed that McM realized a net loss of $4,783,964.  BMO-253.

At trial, Mueller was not aware of any material differences between the draft and final

versions of the YE 2015 financial statements.

In conjunction with the preparation of the YE 2015 financial statements, Mueller

asked Eide Bailly for detail regarding some of the numbers in the statements.

Specifically, she asked Eide Bailly for the source of the potato inventory data and for a

list of accounts payable and accounts receivable.  Eide Bailly informed Mueller that

Debtor provided the potato inventory data.  Mueller did not ask Eide Bailly whether it

tested the data.  Mueller acknowledged she had no reason to believe Eide Bailly verified

any of the information McM provided and admitted she did not verify the information she

received from Eide Bailly.

Despite this lack of verification, Mueller testified she relied on the accountants'

conclusions and the accuracy of the information in the YE 2015 financial statements in

---

a review engagement is an accrual-based financial statement.  She acknowledged that
there is an "immense" difference between cash and accrual basis accounting.

[29] Investment in future crop included equipment leases, rent, chemical, fertilizer,
seed, fuel, labor, drainage/tillage, supplies, repairs, insurance and soil testing.  BMO-
253.  According to Richard, these items were included in investment in future crop
because it was inventory that would be used for the 2016 crop.  She understood that
McM prepaid for these supplies and expenses as of December 31, 2015, "because
accounts payable isn't large enough to cover that, so . . . it would have had to be paid
for."  BMO-313 at 95.

Case 18-07022   Doc 140   Filed 02/26/21   Entered 02/26/21 11:35:11   Desc Main
Document   Page 33 of 77

recommending that BMO make the $8 million loan to McM in 2016.  Mueller maintains

she relied on the fact that Eide Bailly prepared the YE 2015 financial statements

according to GAAP even though GAAP accounting alone does not ensure the accuracy

of data.  She testified that she regularly relies on accountants to provide accurate

financial statements.  When she receives financial statements from borrowers, she does

not perform the accountants' work again, but instead assumes the work product is

accurate.  When accountants prepare financial statements, Mueller expects that they

have "done their job."  Mueller testified she did not "have any knowledge that Eide Bailly

did not do its job in connection with [the YE 2015 financial statements]."[30] She claimed

BMO did not violate its credit policy by relying on the reviewed YE 2015 financial

statements.[31]

---

[30] Although Mueller suggested at trial that she did not have any knowledge that "Eide Bailly did not do its job," BMO initiated a lawsuit against Eide Bailly in January 2019, alleging Eide Bailly breached its duty to BMO through negligent acts, misrepresentations and omissions in connection with its work for McM, and it failed to plan, review and deliver the final 2015 McM financial statements in accordance with GAAP.  D-252.

[31] Mueller testified that she is familiar with BMO's policy related to the use of compiled, reviewed and audited financial statements.  Under BMO's policy, reviewed or compiled statements are acceptable only if a borrower's accounting system is reliable.  D-135.  When asked what experience McM had that would have made accepting a compiled statement reasonable, Mueller responded that she did not know because she was not a part of the decision to allow an exception to the policy.  BMO approved the exception when it approved the original loan in 2012.  She was unable to point to any account officer visitation review procedures or commercial audits.

In Richard's opinion, however, if there were errors in McM's financial documents relating to understated accounts payable and overstated inventory, the likelihood that these errors would have been discovered in an audited review was "very high."  BMO-313 at 129–130.  Expert witnesses Enger and Larson agreed.  Enger opined that, if an accountant had prepared audited financial statements for McM, he or she would have discovered unreported accounts payable.  Likewise, Larson testified that, if McM's financial statements had been audited, the accountant would have discovered that McM

a.    **Accounts Payable**

In its YE 2015 financial statements, McM reported that its accounts payable

totaled $24,660 as of December 31, 2015.  BMO-253.  Consistent with this figure,

Gauthier sent an email to Wilmer in early 2016, with an attached document titled "A/P

Aging Detail" showing that McM's accounts payable as of YE 2015 totaled $24,659.79.

D-244 at 99.  Gauthier explained in her trial deposition testimony that the document

listed all McM's unpaid expenses as of December 31, 2015, except those for chemical,

fertilizer, seed and any other crop input supplies that were not due to be paid.  Some of

the suppliers that provided McM inputs in 2015 were not listed on the report because,

as discussed more fully above, Gauthier did not input suppliers' invoices into

QuickBooks until they were due (or paid) in March.[32]  For example, McM owed

Columbia Grain $989,275.95 and Johnson Potato Company $300,000 for 2015 input

expenses that were not "due" until March 2016.  See BMO-314; BMO-315.

Consequently, when Debtor delivered McM's YE 2015 financial statements, these

invoices were not recorded in QuickBooks or listed as accounts payable on the financial

statements because these debts were not yet "due."  Gauthier was not sure whether

---

reported its accounts payable on a cash basis.  Larson explained that extensive testing
is performed for an audited financial statement.  For example, in preparing an audited
financial statement, the accountant would typically count inventory or probe to verify the
inventory exists.  For accounts payable and accounts receivable, accountants typically
conduct third-party confirmation, including sending letters to customers and creditors to
ask them to confirm the account balances on financial statements.

[32] At YE 2014, McM owed Columbia Grain $1,951,515.28 and J.R. Simplot
$781,319.36.  BMO-314; BMO-316.  These debts were not "due" until March 2015.
Consistent with its practice of paying input suppliers in the calendar year after it
consumed the supplies, McM paid the J.R. Simplot invoice on March 18, 2015, and the
Columbia Grain invoice sometime after March 31, 2015, and before June 30, 2015.

Eide Bailly knew about this process, but she observed that Eide Bailly would have seen the payments in March when McM paid bills.  She was also not sure whether McM communicated to Eide Bailly that 2015 input supplier debts had not been paid.

Although Richard testified that she "would have inquired" about whether all the accounts payable were recorded, she did not recall anyone from McM ever acknowledging that they were in fact accruing liabilities.  According to Richard, Eide Bailly's inquiries to McM never included a specific question about whether there were accounts payable or unpaid liabilities for input supplies at any time during 2014 or 2015.[33]  Mueller acknowledged that she never discussed McM's accounts payable with Debtor other than asking for a list of accounts payable.

At trial, Debtor insisted the $24,660 accounts payable reported in the YE 2015 financial statements was accurate according to cash basis accounting.  Although Debtor knew that McM owed CPS over $2,000,000 and other large debts to Columbia Grain and Johnson Potato Company at the time Eide Bailly prepared the YE 2015 financial statements and that McM had not disclosed this information to BMO, he insisted that the financial statements accurately reflected how McM kept its books (on a cash basis). McM intended to pay the 2015 bills as they came due, which meant using a portion of

---

[33] In August 2017, Richard learned that McM had not included all debts it owed to 2015 suppliers in its YE 2015 financial statements.  Specifically, Richard read an article in Agweek in which the author claimed that McM owed $3,000,000 in 2015 crop season payables in 2016.  On August 17, 2017, she called Debtor and asked him why he did not tell her about the 2015 payables, but he did not answer.  She told him the payables should have been recorded on the YE 2015 financial statements because they related to 2015 crop inputs.  She claims Debtor did not tell her and she did not know McM was obligated to 2015 input suppliers or that these debts were not due until March 2016, or that McM paid these debts with 2016 operating funds.  She confirmed their conversation in writing.

the 2016 loan funds to pay McM's 2015 accounts payable.  When asked why he did not

provide this accounts payable information to BMO, Debtor stated that BMO never asked

for this information.[34]

### b.    Compliance Certificate

Debtor signed a compliance certificate on March 28, 2016, in which he

acknowledged that McM failed to comply with several loan covenants, including:

- Tangible net worth of not less than $11.5 million, McM's net worth was $6,788,445;
- Fixed charge coverage ratio of not less than 1.05 to 1.0, McM's ratio was only 0.70 to 1.0;
- Fixed asset expenditures not to exceed $500,000 in one fiscal year, McM's were $635,623;
- Working capital as calculated at the end of the fiscal year totaling not less than $3.5 million, McM's was -$1,190,855;
- Obligations under real estate leases not to exceed $9.5 million, McM's totaled $10,780,059;
- Obligations under other leases not to exceed $5 million, McM's were $5,804,864.

BMO-217.

In the compliance certificate, Debtor also represented that the covenant

calculations and McM's financial statements referenced in the certificate were accurate.

BMO-217.  Eide Bailly prepared the financial data in the compliance certificate using

McM's YE 2015 financial statements.  Debtor maintains this certification was true.

According to Debtor, he never provided BMO false information in the YE 2015,

1Q 2016 or any of McM's financial statements or projections, and he never intended to

---

[34] At his deposition, Debtor claimed he did not provide accounts payable information to BMO because unsecured debt recorded in accounts payable was not a threat to BMO.  He claimed McM's balance sheet showed McM's net worth was sufficient to cover its obligations, and Debtor had also personally guaranteed McM's debt.

provide inaccurate information to BMO to mislead it.  Further, Debtor asserted that none

of McM's lenders ever told him he should not be using cash basis accounting.  In fact,

McM used cash basis accounting since it was formed in 1995 because—to the best of

Debtor's knowledge—that was what McM's lenders wanted it to use.  Debtor asserted

McM must have been keeping its books as BMO wanted because, if it had been an

issue, BMO would have raised it.  Neither McM's lenders nor accountants told Debtor

that McM was required to change how it kept its books to prepare GAAP-compliant

reports.  He also maintained BMO never told him that it wanted McM's books kept on an

accrual basis.  Debtor asserted he would have remembered if it had because it would

have been a major change in how McM was reporting.  Additionally, none of the

accountants ever told him there was any problem with McM's use of QuickBooks.

### 2.    2016 Loan Approval Process

Funding of the 2016 operating loan to McM required the recommendation and

approval of several people at BMO.  On April 6, 2016, Mueller completed a Form 959,

which BMO employees used to document status updates and changes in the credit

relationship, to submit credit requests and risk rating changes, and to assemble data for

the regulation of high-risk loans.  BMO-260.  In the Form 959, Mueller recommended

BMO approve a new $8 million loan to McM for input and operating expenses related to

the 2016 crop year.  She also recommended short-term extensions of the $32 million

loan and the $1.5 million hedging loan.  Mueller referenced information from the YE

2015 financial statements and the cash flow budget in the Form 959, and she testified

that these were the documents on which she relied most in recommending BMO

approve the 2016 loan to McM.  When Mueller completed this form, she did not know

that McM had $3 million in unpaid accounts payable from 2015.  She also did not know that McM was purchasing input supplies for 2016 on credit.

In accordance with BMO's credit approval process, Mueller forwarded her recommendation to Burke and then to Hirji because of the size of the loan.  Both recommended BMO grant McM the operating loan.  Next, Hirji forwarded the loan package to the credit officer for review.

Before the credit officer completed his review, Debtor sent an email to Mueller and Sloan, inquiring about the status of McM's operating loan application.  In this April 11, 2016, email, Debtor explained that McM's landlords were demanding delinquent land rent payments, and McM could not "in good faith seed crops on land in which rents have not been paid."  He also conveyed the urgency of McM's loan request:

> I have not heard from you exactly where I stand right now.  I was hoping to have funds at least by this week and that is what I have been conveying to my Landlords.  I do not think I will be able to hold much of this land past this week as landlords are concerned and tired of being pushed back.  There is also the need to be able to purchase fertilizer and seed as well this spring, as our monthly cashflow statement has presented.
>
> I have been liquidating anything that I do not need to generate cash.  That along with weekly potato proceeds have been keeping things going but the rents are a large part of our financing needs and while I have been trying to send partial rents to keep these folks content, they are showing fear of not getting all of it from me and they are now questioning the fidelity of our farm. What's worse is that if I cannot retain the acreage in our farm plan, I will have lost the investments of millions of dollars in equipment payments, labor and prepaids up to this point.
>
> * * *
>
> I feel that if something is not done very quickly, I should plan on some sort of liquidation actions.  There is really nothing else that I can do but to stop investing in a crop that isn't going to be planted and inputs that cannot be recovered.

If this crop cannot be funded, it would have been good to have determined this back February. At least then there would have been a partial halt to investing in a crop that was never to be. Without a land base, there is no way of generating income.

Please, give me direction how to proceed as soon as possible. I need to know one way or another this week. At the very least, it is the respectful thing for you to do for me. I am prepared to deal with either outcome that you may give me, but I cannot continue any longer without any dialogue or actions on the part of BMO.

BMO-262. Mueller thought that the urgency Debtor expressed in this email related in part to McM's need for financing to pay for inputs for the 2016 crop as reflected in the cash flow budget. Mueller assumed McM planned to spend some of the 2016 loan proceeds to pay 2016 input suppliers.[35]

Two days after BMO received Debtor's email, Mike Wood, the credit officer who reviewed the McM loan approval package, sent questions to Mueller regarding loan terms:

The main question I have at this point is how do we ensure that cash isn't spent on 2017 crop before we decide if we want to go forward with this client? It appears that McM has spent over $8mm on 2016 without any agreement from us on how the balance of the season would be financed. That leaves us little choice but to fund the full season so we can try to capture that $8mm of value. I don't want to be put in that position again next year. So we need to ensure that no money is spent for 2017 without our knowledge and consent. And we need to make a conscious decision about 2017 in total.

---

[35] The next day, on April 12, 2016, BMO received a faxed letter from CPS stating that McM listed BMO as a credit reference on a credit request. BMO-306. Mueller informed Debtor about the inquiry and explained that BMO required an updated, current authorization from McM to provide the credit reference to CPS. Debtor did not provide an updated authorization. Eight days later, Debtor (on behalf of McM) entered into a financing contract with CPS for the purchase of fertilizer, chemical and seed. BMO-271.

BMO-265.  Mueller responded by detailing her plan to closely monitor McM to ensure it spent no funds on prepaid expenses for 2017.  She also highlighted Debtor's cooperation:

> Ron McMartin understands the current situation.  He has provided me with all of the information I have asked for, has been transparent and is working cooperatively with Eide Bailly and BMO which I view as a huge positive.

Id.

On April 14, 2016, Wood approved the $8 million operating loan to McM for 2016, observing that "[f]inancial reporting has been improved."  BMO-268; D-242.  Mueller informed Debtor the same day.  BMO-266.

On April 20, 2016, Mueller answered several questions posed by Kevin O'Neill, a member of BMO's credit audit group, about Mueller's review and due diligence regarding McM's projections.  Mueller responded, "Projections appear to be reasonable and were prepared in conjunction with Eide Bailly.  Yields used were based on historicals and prices were in line at the time the budget was prepared."  BMO-278.  She attached McM's cash flow budget to her email response.

BMO funded the 2016 loan to McM on April 22, 2016.  BMO-269; BMO-211.  BMO and McM executed a Fourth Amendment to Master Loan Agreement effective April 22, 2016, and Debtor signed related notes and a guaranty acknowledgment.

The same day BMO funded McM's 2016 operating loan, Gauthier sent an email to Mueller requesting $7.25 million of the $8 million approved by BMO.  D-244.  Her email included a "breakdown" of how McM intended to allocate the funds.  Gauthier understood that McM intended to use the funds to pay debts for seed, chemical, fertilizer, equipment and land lease payments that were due in March and April 2016.

Gauthier had been holding creditors at bay for several weeks by this point.  She did not tell Mueller that McM planned to use some of the money to pay for 2015 inputs.

According to Debtor, BMO's delay in approving the 2016 loan and BMO's ultimate approval of $2,000,000 less than budgeted resulted in negative consequences for McM.  Specifically, McM did not receive operating money in time to make all its land rent payments, as Debtor warned Sloan and Mueller in his April 11, 2016, email.  Consequently, McM farmed 29,000 acres rather than 38,760.7 acres as planned and budgeted.  Debtor did not advise BMO that McM was forced to farm fewer acres than planned, and he did not provide revisions to the cash flow budget to account for the difference.

On May 12, 2016, McM delivered its 1Q 2016 financial statements to BMO.  The statements are dated March 31, 2016.  BMO-290.

### 3.    Loan Defaults

On May 24, 2016, Mueller sent McM a Notice of Default and Reservation of Rights on behalf of BMO.  BMO-218.  Mueller enumerated the six loan covenants that McM failed to satisfy as of December 31, 2015.  In the notice, she stated that the covenant violations constituted events of default permitting BMO to exercise its default-related rights and remedies.  Mueller testified that BMO sought payment on its loans to McM.

On June 17, 2016, Debtor emailed Mueller an updated cash flow statement reflecting McM's budgeted and actual expenses for January through April 2016.  BMO-281; BMO-282.  Despite the loan defaults, on June 20, 2016, BMO loaned McM an additional $1 million because "there were hedge positions that needed to be funded and

there were other necessary expenses that needed to be funded . . . in June and July of
2016 related to payroll."[36]  Mueller testified that she relied on the updated cash flow
statement in recommending the June 2016 loan.  BMO-282.  She also relied on McM's
1Q 2016 compiled financial statements (which she claims did not accurately disclose
the YE 2015 accounts payable).  BMO-290.

### G.    Harney Management Partners and Davis Jackson

As part of the agreement to lend McM an additional $1 million in June 2016,
BMO required McM to retain a turnaround consultant to assist McM "on strategic,
operational and financial matters (including cash flow and expense management)."
BMO-214.  BMO referred McM to Harney Management Partners, a financial advisor and
turnaround consultant, and Debtor hired Harney Management Partners.

Davis Jackson, a CPA who worked as an independent contractor for Harney
Management Partners, participated on the consulting team that provided analysis and
advice to McM.[37]  Jackson traveled to North Dakota to visit McM's properties in July
2016.  During this visit, Jackson's task was "to get control of the cash and monitor the
harvest and then, to the extent time permitted, look at what the records showed about
how the financial condition had come to be what it was."  BMO-312 at 8.  Part of this
work included categorizing cash receipts and disbursements for the past several years

---

[36] BMO and McM executed a Fifth Amendment to Master Loan Agreement
effective June 20, 2016.  Debtor also signed related notes and an Acknowledgement of
Guaranty on the same day.

[37] The Harney Management Partners consulting team also included Jim Harney,
who took the lead on the engagement, and Greg Milligan, who assisted with drafting
documents.  Jim Szczepanik was the leader of the "boots-on-the-ground effort."  BMO-
312 at 9.  Jackson summarized his role as "staff and operations and checking the
harvest."  Id.

so the consulting team could prepare "a reasonable budget for the harvest."  Id. at 11.

According to Jackson, he and team member Jim Szczepanik were:

> trying to come up with a budget for how much the 2016 harvest might
> produce so that we could explain to [BMO] here's where it looks like you're
> going to wind up at the end of harvest and [BMO] could make a decision did
> they even want to proceed at that point.  So we wanted a very accurate best
> forecast we could get for what the crops that were in the ground were likely
> going to produce.

Id. at 12–13.

In his analysis of McM's financial documents in July 2016, Jackson learned that
McM was not reporting all its accounts payable on an accrual basis.  During a
conversation with Gauthier, Jackson and Szczepanik discovered that McM had received
invoices from crop input suppliers that Gauthier had not recorded in QuickBooks.
Gauthier showed Jackson where she stored these invoices.  Based on this
conversation, Jackson concluded that "McM had been in the habit of only entering
invoices from vendors when McM was ready to pay them."  Id. at 64.

Jackson reported this discovery to Mueller, who asked him whether the funds
BMO loaned McM in April 2016 were used to pay invoices from 2015 input suppliers.
Jackson ultimately learned that McM paid the invoices for some 2015 crop inputs after
McM received its 2016 loan from BMO.

In his effort to forecast McM's 2016 revenue from the 2015 potato crop, Jackson
reviewed McM's historical information including revenues McM received in 2015 from
the 2014 potato crop.  He discovered approximately $3,082,000 in cash receipts
recorded as 2014 potato revenue in McM's financial records in August and September
2015.  According to Jackson, this discovery raised questions about McM's arrangement
with potato sheds (companies that stored McM's potatoes).  When he asked Debtor

about McM's arrangement with the potato sheds in light of the $3,082,000 in receipts,

Debtor explained that he contributed the $3 million to McM and called it potato

revenue.[38]  Id. at 16–17, 20.[39]  Debtor told Jackson, "the bank wanted to see potato

revenue so I showed them potato revenue."  Id. at 20.[40]  Debtor asked Jackson if he

(rather than the Harney Management Partners team) could tell BMO that the

$3,082,000 in potato revenue was actually Debtor's cash contribution.  A few days later,

Debtor consented to the team disclosing the information to BMO.

To develop a cash flow forecast for the 2016 crop, Jackson also analyzed McM's

YE 2015 inventory and its estimated revenue in 2016 from 2015 crops.  His review of

McM's inventory and estimated revenue raised questions about the accuracy of McM's

estimates.  McM's YE 2015 financial statements show inventories valued at

$13,672,974.  D-130; BMO-253. The inventories spreadsheet Eide Bailly prepared with

Debtor's input shows that the potato inventory comprised $11,094,741 of this sum.

BMO-274.  Of the more than $11 million in potato inventory, McM planned to sell

$10,149,741 (821,336 cwt x $12.36/cwt).  Id.

---

[38] In September or October 2016, Jackson learned that Kenny Johnson loaned
Debtor $100,000 and Frayne Berg loaned Debtor $500,000 that Debtor used to make
the $3,082,000 contribution.  McM repaid all or part of the debt to Berg and
characterized the payment as an insurance expense because "Berg was an insurance
vendor."  BMO-312 at 38.  Debtor did not inform BMO about the transactions with Berg
or Johnson at the time he made them.

[39] Debtor's hearsay objection to this deposition testimony is overruled.

[40] Debtor's hearsay objection to this deposition testimony is overruled.

The 821,336 cwt in red potato inventory reflected Debtor's estimate of total 2015

potato production (1,162,311 cwt) less shrinkage,[41] 2015 potato sales and potato seed.

Jackson suggested that there was a discrepancy between Debtor's "good faith"

estimate of total potato production and the actual potato production harvested in 2015.[42]

During his July 2016 conversation(s) with Jackson and at trial, Debtor maintained

1,162,311 cwt was a "good faith" estimate of total potato production.

According to Mike Hilde, McM's potato manager from approximately 2010 to

2017, as of February 27, 2015, he planned to plant 3,898 acres of potatoes for crop

year 2015 and anticipated 851,268 cwt in total production.  BMO-301 at 27–28.[43]

Hilde's February 2015 production estimate was over 300,000 cwt lower than Debtor's

February 2016 inventory estimate for crop year 2015.  Based on Hilde's recollection of

the 2015 crop year, the conditions that existed that year and his potato plan, he had no

----

[41] According to Jackson, shrinkage manifests in a couple ways.  First, dirt sticks to the potatoes when they are harvested and loaded on the trucks, so the weight of potatoes taken from the fields is not always the weight logged by the potato shed.  Next, literal shrinkage occurs because some of the water in potatoes evaporates.  Finally, shrinkage includes potatoes that are rated as unmarketable to the grocery market.

[42] The Court received no admissible evidence from Jackson's deposition supporting this discrepancy.  BMO's request that the Court receive Exhibit 1 (BMO-275) to the Deposition of Davis Jackson is denied.  Debtor's hearsay objections are sustained because the email is hearsay recording hearsay or admissions.  The hearsay exception in FRE 803(5) does not apply because the "recorded recollections" in the Exhibit 1 were not read into the record.  Additionally, Debtor's objections to Jackson's testimony about this discrepancy on pages 41–45 of his deposition are sustained.  Further, BMO failed to offer admissible evidence of the underlying data on which Jackson relied in Exhibit 1.  BMO also offered Exhibit 2 (BMO-276), an email with a draft report attached.  Debtor's objections to admissibility of this exhibit are sustained. BMO did not offer Exhibit 3 (BMO-277) during this deposition.

[43] Debtor's objections to this deposition testimony are overruled.

reason to believe McM could produce 1,162,311 cwt in potatoes as Debtor estimated. Id. at 62.[44]

In late July 2016, BMO learned that McM owed more suppliers than anticipated, resulting in higher accounts payable, and that McM's potato revenue forecast for the 2015 crop was not "realizable."  D-239.  According to information Mueller reported to other BMO decision makers on July 27 and 29, 2016, preliminary field examination results showed that McM's total revenue from 2015 crop year potatoes totaled only $4.5 million, approximately $5.6 million less than expected.  Id.; D-240.  BMO learned that "one of the primary reasons for the variance" was that McM and its accountants did not "properly account for" washing, packing and storage costs associated with the sale of potatoes.  D-234.  According to BMO,

> McM reported the gross sale price in the cash flow budget as being received in cash vs. the amount net of sale costs they actually receive in cash.  It also appears that Eide Bailly (EB) did not take into account the cost of washing/packing/storage in the potato inventory calculation as of 12/31/2015, so it was not on the books at net realizable value.

Id.  Debtor had previously advised BMO about these washing, packing and storage fees in a conversation with Sloan in September 2015.  BMO-226.

Based on Mueller's conversations with Jim Harney, "there would most likely be a write-down of between $10 [million] and $11 [million] of receivables and inventory values, as the values previously reported on the 12/31/2015 FYE and 3/31/2016 compiled interim statement were not accurate."  D-249.  Mueller explained that the $10 million to $11 million negative variance was attributable to the reduction in potato accounts receivable and inventory, a negative adjustment in estimated revenue

---

[44] Debtor's foundation objection to this deposition testimony is overruled.

because McM farmed fewer acres of crops than expected and a $2.75 million reduction in equipment value.  D-239.  On July 25, 2016, Mueller sent McM another Notice of Default and Reservation of Rights, citing loan violations including failure to furnish accurate financial statements, to maintain accurate books and records and to fairly and accurately represent all financial information, disclosures, projections, predictions and forward-looking statements.  BMO-219.

After considering this updated information, Hirji wrote the following comments in an internal BMO document dated August 1, 2016:

> An analysis is included in the CAF under supplementary documents as an addendum to ascertain what would have happened back in April when we funded $8MM to the client for the 2016 crop year if we knew then what we know now.  At the time, the funding was approved as significant dollars were already used for pre-paid and liquidating at the time appeared would create a loss to the Bank of $13MM.  By funding the 2016 crop season, it was expected to significantly reduce this shortfall to $6MM by the end of the season, with the expectation that we would further reduce this shortfall the following season to work our way out of the negative position.  Given that we now know the information we were working with had many holes in it, the addendum shows that the loss to the Bank back in April if we chose not to fund would have likely been more like $26MM versus the $13MM.  Thus, the original rationale to fund the 2016 crop year still seems to have been appropriate as by doing this, we have created significant income for 2016 such that the loss as per the 959 will likely be in the $20MM range (versus $26MM if we did not finish the 2016 crop season).  Note: We have given no value to any equity in leased equipment given the issues in the information we have been given.  There may potentially be some upside here but we will re-assess same once we have been able to dig deeper to see what we got.

D-241 at 1.

Harney Management Partners' role with McM transitioned over the summer from financial advisor to chief restructuring officer of McM as of August 9, 2016.  As chief restructuring officer, it became responsible for the day-to-day management of McM, among other duties.  In late August 2016, Harney Management Partners resigned from

the position of chief restructuring officer.  After Harney Management Partners resigned, Jackson independently contracted with McM to serve as its interim chief financial officer.

### H.    Late 2016 and Beyond

#### 1.    Debtor's Efforts to Maintain the McM Farming Operation

In late September 2016, Debtor sold his home and used the $389,000 in sale proceeds to pay McM's expenses.  He explained that, by this time, McM's relationship with BMO was "stressed" and funding was unreliable, which was impacting McM's ability to maximize the harvest.  McM had not completed the harvest, it was delinquent on its equipment payments, suppliers were threatening to repossess equipment, and BMO provided no support to address the situation.  Debtor testified he used the money from the sale of his home to complete the harvest and to try to generate as much revenue as possible to pay BMO.[45]

In November 2016, Debtor opened a second account at Ramsey National Bank under McM's name but did not inform BMO about this account.  Under McM's loan agreements, McM was not permitted to hold an account at another bank.  Debtor explained that McM received beet checks in November 2016 from the 2015 beet crop, and the checks did not include BMO's name on them.  According to Debtor, McM's relationship with BMO had deteriorated, and McM needed resources to pay bills and

---

[45] According to Debtor, he did not receive a paycheck or any personal benefit from BMO's loan to McM in 2016.  Gauthier confirmed that Debtor did not receive a salary "for a long time," and that he used his personal resources to cover McM's expenses.  D-244 at 179.  Mueller conceded that, to her knowledge, Debtor did not personally benefit from the 2016 loan proceeds.  Although Debtor was not receiving a paycheck from McM in 2016, Mueller insisted he received payments that he should have deposited in McM accounts.

harvest crops.  Consequently, Debtor deposited the beet crop proceeds into the new account to pay operating expenses and harvest the crop that collateralized BMO's loan.

Sometime during the spring and/or summer of 2016, suppliers filed lien notices against McM's crops and crop proceeds.  Although Debtor testified that suppliers had agreed to refrain from filing crop liens in 2016, these agreements were oral.  In the summer of 2016, "the word was out" and "the whole country knew" that McM had not paid its land rents on time, and "blood was in the water."  The suppliers filed liens despite the oral agreements; McM had no way to enforce this term.

### 2.    BMO's Hindsight

As summarized in BMO's internal documents, Mueller, Burke, Hirji and Wood thought BMO's loss on the McM loans would be greater if BMO declined to fund McM's operation in 2016.  In fact, Mueller was unable to articulate any loss to BMO from the delay in liquidating McM until after the 2016 season aside from some equipment deterioration.

At trial, Mueller initially testified that, if she had known that McM failed to include more than $3 million in invoices for 2015 inputs in McM's YE 2015 accounts payable, she did not believe she would have recommended that BMO approve the $8 million 2016 operating loan to McM.  She also testified that she would not have recommended the loan if she had known the funds would be used to pay accounts payable from 2015 or would not be used to purchase 2016 inputs.   She explained she would not have recommended the loan if she knew suppliers would file liens against the 2016 crop proceeds.  She claimed her recommendation would have been different because the budget and analysis would have been different.  She maintained that, if she had learned

these facts, they would have raised credibility issues regarding the accuracy of the information BMO considered.  According to Mueller, the incorrect information Debtor provided BMO was material to her decision to recommend the loan.

On cross examination, however, Mueller was unable to say whether BMO's decision to approve the 2016 loan would have been impacted if McM had reported the additional accounts payable.  She insisted it would have been a factor because, if BMO had known about the accounts payable, accurate revenue numbers and the sum of prepaid expenses, BMO would have considered these factors.  Still, she was not sure how it would have affected BMO's ultimate decision to lend to McM in 2016.  BMO focused on the prospect "that the 2016 loan would help it realize the up to $8 million that McM had expended in 2015 for the 2016 crop year and 2016 crop expenses."  Likewise, Sloan was unable to say what change in McM's financial situation would have altered BMO's decision to loan money to McM.  As to accounts payable in particular, he would "just be guessing if a larger amount for accounts payable would have altered BMO's decision to make loans to McM."

I.     **Bankruptcy**

Debtor petitioned for relief under Chapter 7 of the Bankruptcy Code on September 11, 2017.  One of McM's suppliers initiated an adversary proceeding against BMO and other suppliers and interested parties, seeking an order determining priority to McM's 2016 crops and crop proceeds.  The parties resolved their dispute through mediation.  BMO ultimately received $5,078,487.91 in proceeds from the 2016 crops from the bankruptcy estate and $38,274.66 from an input supplier.  BMO did not recover all of the $9 million it loaned McM in 2016.  As of December 29, 2017, the remaining

loan balance on the April 2016 operating loan was $3,051,237.43.  At trial, Mueller did

not anticipate any additional distributions that will affect the loan balance.

## III.   CONCLUSIONS OF LAW

### A.   Jurisdiction

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  The

Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and authority to enter a final

order in this matter.  This opinion constitutes findings of fact and conclusions of law in

accordance with Federal Rule of Bankruptcy Procedure 7052.

### B.   Exceptions to Discharge Under 11 U.S.C. § 523(a)(2)

"One of the 'main purpose[s]' of the federal bankruptcy system is 'to aid the

unfortunate debtor by giving him a fresh start in life, free from debts, except of a certain

character.'"  Lamar, Archer & Cofrin, LLP v. Appling, 138 S. Ct. 1752, 1758 (2018)

(quoting Stellwagen v. Clum, 245 U.S. 605, 617 (1918)).  "To that end, the Bankruptcy

Code contains broad provisions for the discharge of debts, subject to exceptions."  Id.

Exceptions to discharge are narrowly construed to effectuate the "fresh start" of the

Bankruptcy Code.  Cmty. Fin. Grp., Inc. v. Fields (In re Fields), 510 B.R. 227, 233

(B.A.P. 8th Cir. 2014) (citation omitted).

One of those exceptions is found in 11 U.S.C. § 523(a)(2), which provides that a

discharge under Chapter 7, 11, 12, or 13 of the Bankruptcy Code "does not discharge

an individual debtor from any debt . . . for money, property, services, or an extension,

renewal, or refinancing of credit, to the extent obtained by" fraud.  This exception

advances the Bankruptcy Code's policy of affording relief only to an "honest but

unfortunate debtor."  Id. (citing Cohen v. de la Cruz, 523 U.S. 213, 217 (1998)).

More specifically, subparagraph (A) bars discharge of debts arising from "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition."  11 U.S.C. § 523(a)(2).  Subparagraph (B), in turn, bars discharge of debts arising from a materially false "statement . . . respecting the debtor's . . . financial condition" if that statement is "in writing."  Id.

"The text of § 523(a)(2) plainly heightens the bar to discharge when the fraud at issue was effectuated via a 'statement respecting the debtor's financial condition.'" Appling, 138 S. Ct. at 1763.  In addition to the requirement that the statement be in writing, subparagraph (B) requires a creditor to show reasonable reliance, while subparagraph (A) requires only the lesser showing of justifiable reliance.  Id. at n.6.

## C.    Section 523(a)(2)(B)

BMO seeks a denial of Debtor's discharge of his debt to BMO under 11 U.S.C. § 523(a)(2)(B).  This subsection provides that a debt is nondischargable:

(2)    for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

* * *

(B)    use of a statement in writing—
(i)    that is materially false;
(ii)    respecting the debtor's or an insider's financial condition;
(iii)    on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv)    that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a).  In other words, for a debt to be nondischargeable under section 523(a)(2)(B), a creditor must prove that the debtor obtained money by (1) use of a statement in writing that was materially false; (2) that pertained to his or his business's financial condition; (3) on which the plaintiff reasonably relied; and (4) that the debtor

made or caused to be made with the intent to deceive the plaintiff.  <u>Bank of Neb. v.</u>

<u>Rose</u> (<u>In re Rose</u>), 483 B.R. 540, 543–44 (B.A.P. 8th Cir. 2012).  BMO must prove each

element by a preponderance of the evidence.  <u>See</u> <u>The Samuel J. Temperato</u>

<u>Revocable Tr. v. Unterreiner</u> (<u>In re Unterreiner</u>), 699 F.3d 1022, 1025 (8th Cir. 2012)

(citing <u>Jacobus v. Binns</u>, 328 B.R. 126, 130 (B.A.P. 8th Cir. 2005)).

BMO asserts that Debtor made several specific false written statements that

satisfy the elements of section 523(a)(2)(B):

- March 4, 2016, email regarding the number of acres McM intended to farm in 2016
- McM's YE 2015 financial statements
- Compliance certificate dated March 28, 2016
- McM's 1Q 2016 financial statements
- McM's 2016 cash flow budget

The statements BMO lists are statements in writing that pertain to McM's

financial condition.[46]  Although the statements relate to McM's financial condition rather

than Debtor's, the Court may except Debtor's debt to BMO from discharge if BMO

proves all the elements of section 523(a)(2)(B) because McM is an insider of Debtor

and vice versa.[47]  <u>See</u> 11 U.S.C. § 101(31)(A)(iv) (defining "insider" to include

"corporation of which the debtor is a director, officer, or person in control.").

---

[46] In <u>Lamar, Archer & Cofrin, LLP v. Appling</u>, the Supreme Court noted that a statement "respecting" a debtor's financial condition must have "a direct relation to or impact on the debtor's overall financial status."  138 S. Ct. 1752, 1761 (2018).  While <u>Appling</u> prevents strict interpretations that limit an actionable statement of financial condition to financial-type statements, such as balance sheets or income statements, there is still a requirement for the written statement to relate to the debtor's overall financial status.  <u>See id.</u>

[47] <u>See</u> <u>Paik v. Lee</u> (<u>In re Lee</u>), 536 B.R. 848, 858 (Bankr. N.D. Cal. 2015) (a corporation of which the debtor is a director, officer, or person in control qualifies as an "insider" of the debtor for purposes of nondischargeability under section 523(a)(2)(B)); <u>Helena Chem. Co. v. Richmond</u> (<u>In re Richmond</u>), 429 B.R. 263, 297 (Bankr. E.D. Ark.

Debtor does not dispute that the representations at issue were statements in writing that pertained to McM's financial condition. Rather, he asserts the representations were not materially false, that he did not intend to deceive BMO and that BMO did not rely on the representations. Either way, BMO established that Debtor owes a debt for money, property, services, or an extension, renewal, or refinancing of credit, that Debtor obtained for McM by using a statement in writing respecting an insider's financial condition.

### 1.   The March 4, 2016, Email Regarding Acreage

BMO argues the email Debtor sent to Mueller on March 4, 2016, was materially false because Debtor represented that McM would be farming 38,760.7 acres during the 2016 crop year, but it actually farmed only 29,000 acres. BMO offered no evidence to support its claim that Debtor's representation was false on March 4, 2016, the day Debtor sent the email. Apparently recognizing this lack of evidence, BMO also argues that to "the extent [Debtor's] representation regarding acreage was accurate on March 4, 2016, because on that date [he] still intended to plant 38,760 acres, it was not

---

2010) (finding the debtor was an insider of the company that received money because he was the manager of the company, the president of one of its founding partners, a part owner of the remaining two initial partners, was employed by the company, and participated in its proper and improper activities, including the publication of false financial information); Willens v. Bones (In re Bones), 395 B.R. 407, 430 (Bankr. E.D. Mich. 2008) (a corporation was an insider of debtor who owned 75% of the stock in the corporation, was its president, and was the person in control of the corporation); Alside Supply Ctr. v. Kromar (In re Kromar), 258 B.R. 692, 698 (Bankr. N.D. Ohio 2001) (credit application submitted to creditor by Chapter 7 debtor on behalf of his corporation involved the financial condition of an insider of debtor, for nondischargeability purposes, where debtor was corporation's president).

accurate as of June 20, 2016, when BMO loaned an additional $1 million to McM."[48]
Doc. 137.

This argument is unavailing in the context of BMO's claim under section
523(a)(2)(B).  "Falseness is determined as of the time the statement is made, under the
circumstances known and the assumptions accepted at the time."  J & J Homebuilders,
Inc. v. Beck (In re Beck), 2013 WL 145589, at *3 (Bankr. E.D. Mo. Jan. 14, 2013); see
also Nat'l City Bank v. Hill (In re Hill), 2008 WL 2227359, at *3 (Bankr. N.D. Cal. May
23, 2008) (listing as among the elements under section 523(a)(2)(B) that the debtor
knew the representation was false at the time he made it); Tompkins & McMaster v.
Whitenack (In re Whitenack), 235 B.R. 819, 826 (Bankr. D.S.C. 1998) (finding that
debtor lacked a knowledge of the falsity of the alleged misrepresentations at the time he
executed them); Benjelloun v. Robbins (In re Robbins), 178 B.R. 299, 304 (Bankr. D.
Mass. 1995) ("A financial statement will not be held materially false due to subsequent
events which make the statement inaccurate at some later time."); Pub. Emp. Ret. Sys.
v. Gadus (In re Gadus), 145 B.R. 235, 237 (Bankr. N.D. Ohio 1992) ("Section
523(a)(2)(B) looks at the accuracy of the financial statement and reliance on it at the
time it was presented, not whether subsequent events make the statement inaccurate at
some later time); Ill. Dep't of Pub. Aid v. Hatcher (In re Hatcher), 111 B.R. 696, 700

---

[48] Similarly, BMO asserts that when Debtor sent the April 11, 2016, email to
Mueller expressing his imminent need for financing, Debtor knew that McM had not
made some of its 2016 land lease payments.  The April 11, 2016, email does not show
that Debtor's March 4, 2016, email was false or that Debtor intended to plant less than
38,760.7 acres in 2016.  It does not even show that some of the land McM intended to
rent was no longer available.  It only shows that landowners were impatient, and Debtor
was concerned about whether McM's opportunity to rent some of the land would soon
be extinguished.

(Bankr. N.D. Ill. 1990) ("In the absence of well-reasoned authority that an initially accurate financial statement can be rendered materially false by the failure to disclose subsequent events, grounds for denying discharge here are not found under § 523(a)(2)(B).").

Accordingly, BMO failed to meet its burden of showing that Debtor's representation in the March 4, 2016, email was materially false.  It is not necessary to analyze the remaining elements under section 523(a)(2)(B) with respect to this representation.

2.      2016 Cash Flow Budget

BMO asserts the 2016 cash flow budget was false because Debtor caused McM to represent that the cash disbursements, including disbursements for input supplies such as seed, chemicals and fertilizer, were for the 2016 crop year.  BMO asserts "[t]his false representation reinforced the false statement about accounts payable in the 2015 Financial Statement, communicating that the itemization of expenses going forward related to the 2016 crop year."  Doc. 137 at 5.  Because the 2016 cash flow budget failed to show that any disbursements would be made in 2016 for 2015 crop year debt, BMO argues that Debtor obscured the fact that McM would be purchasing input supplies for the 2016 crop year on credit.

"A written statement is materially false if it paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information that would normally affect the lender's decision to extend credit."  Northland Nat'l Bank v. Lindsey (In re Lindsey), 443 B.R. 808, 813 (B.A.P. 8th Cir. 2011).

56

The Court is not convinced that the 2016 cash flow budget represents a materially false statement of McM's planned disbursements.  Eide Bailly prepared the cash flow budget on a cash basis, as specifically requested by BMO.  In the cash flow budget, Debtor listed cash disbursements for the 2016 crop year rather than expenses solely related to 2016 crops.  McM's expenses during the 2016 crop year included payments for 2015 input supplies that were not due to be paid until March 2016.  Based on past practice and Debtor's negotiated agreement with these input suppliers, McM did not include expenses for 2016 input supplies that McM would not be required to pay until 2017.  By using the title "Cash Disbursements 2016 crop year," neither Debtor (who assisted with the preparation of this budget) nor McM's accountants specifically represented that all the planned disbursements related only to 2016 crops.  There is no question that this cash flow budget led to a misunderstanding between BMO and Debtor that additional detail or communication might have resolved.  This lack of clarity, however, does not equate to falsity.

BMO also asserts the cash flow budget was false because Debtor projected that McM would repay the 2016 loan in full and decrease the total BMO loan balance to $16,890,860 by December 2016.  It claims that the "projected decrease in the loan balance simply would not be possible if, as Defendant admitted, the 2016 Crop Loan would be used to pay 2015 payables and 2016 input supplies would be purchased on credit, resulting in agricultural supplier's liens."  Doc. 137 at 6.

As discussed above, "[f]alseness is determined as of the time the statement is made, under the circumstances known and the assumptions accepted at the time."  In re Beck, 2013 WL 145589, at *3.  The loan payments McM planned to make were

projections, not statements of actual performance.  The evidence shows that, in February and March 2016, when Debtor and Eide Bailly prepared the 2016 cash flow budget, Debtor assumed McM would pay the remaining 2015 input expenses payable in March 2016 and some of the 2016 input suppliers (whose invoices were not due in 2016) in the spring of 2017.  Based on his agreements with these suppliers, Debtor assumed that the favorable purchase terms granted to McM for the past several years would continue in 2016, including the informal agreements to refrain from filing suppliers' liens.  BMO did not offer evidence sufficient to show that Debtor's estimates and assumptions related to McM's suppliers, its anticipated disbursements, and its loan payments were materially false at the time he provided McM's 2016 cash flow budget to BMO.

Similarly, BMO did not show that Debtor knew his estimates regarding cash disbursements, loan payments and loan balances on the 2016 cash flow budget were false or misleading at the time he made them or that he intended to mislead BMO.  Accordingly, BMO's claim that the cash flow budget serves as grounds for its claim under 523(a)(2)(B) fails for this reason as well.  It is not necessary to analyze the remaining elements under section 523(a)(2)(B) with respect to this representation.

3.      YE 2015 and 1Q 2016 Financial Statements and Compliance
         Certificate

a.      Material Falsity

BMO asserts McM's YE 2015 and 1Q 2016 financial statements were materially false because they inaccurately listed McM's accounts payable.[49]  Specifically, it claims

---

[49] In Plaintiff's Trial Brief, BMO also alleges Debtor materially overstated the value of McM's potato inventory in the YE 2015 financial statements.  Doc. 125.  BMO

that in the YE 2015 financial statements, McM represented accounts payable of

$24,660 when McM's accounts payable as of December 31, 2015, actually totaled

$3,530,265.40.  Similarly, BMO claims that, in the 1Q 2016 financial statements, McM

listed accounts payable totaling $123,873, when McM owed CPS $2,240,989.45 from

input supplies sold to McM in 2015.  BMO also asserts the compliance certificate was

false because Debtor represented to BMO that the YE 2015 financial statements were

accurate.

Debtor asserts that the sums of accounts payable represented in the YE 2015

and 1Q 2016 financial statements were not false on a cash accounting basis, and he

never represented that they were prepared on an accrual basis.[50]  BMO does not

_____

did not repeat this assertion or point to evidence establishing this claim in its post-trial
brief.  Doc. 137.  Even if BMO had reasserted this argument, the Court finds that BMO
did not offer evidence sufficient to show that Debtor's estimate was a materially false
statement Debtor made with intent to deceive BMO.  At trial, Debtor maintained he
provided his 1,162,311 cwt estimate for the total 2015 potato crop production in good
faith.  Although McM's potato manager testified he had no reason to believe McM could
produce potatoes weighing 1,162,311 cwt in 2015, the Court received no admissible
evidence detailing the actual weight of potatoes produced or the variance between
Debtor's estimate and a more reliable estimate as of February or March 2016.
According to Harney Management Partners, the variance between Debtor's estimate
and actual production resulted from McM's accountants' failure to "properly account for"
washing, packing and storage costs associated with the sale of potatoes—factors
Debtor highlighted for BMO in September 2015.  There is also evidence suggesting
McM and its accountants underestimated the amount of "shrinkage."  Consequently, the
Court finds BMO failed to offer evidence sufficient to show Debtor provided a materially
false estimate of total potato production or inventory with intent to deceive BMO.

[50] Debtor further asserts that neither McM nor he ever claimed the YE 2015 and
1Q 2016 financial statements were prepared on anything other than a cash basis.
Although Eide Bailly's review report attached to the YE 2015 financial statements
indicated that Eide Bailly was not aware of any material modifications necessary to
comply with GAAP, neither Debtor nor McM ever made this representation.  Debtor
argues Sloan and Mueller both acknowledged that GAAP dictates only the way data is
presented and not the accuracy of the data.  He asserts that, as a consequence,
whether the financial statements were prepared according to GAAP has no significance
to the question of whether the financial statements were false.

appear to dispute Debtor's claim that the financial statements reflected accurate information if prepared using cash basis accounting, and it offered no evidence suggesting otherwise.  The dispute appears to center on the parties' assumptions and misunderstandings related to McM's accounting practices.

BMO claims McM was contractually obligated to provide its financial statements in compliance with GAAP, which requires the use of accrual basis accounting.  The Court is not entirely convinced that McM's failure to comply with this contract term rises to the level of material falsity if the underlying data was correct but McM's accountants represented that it was compiled using a different accounting method.  The Court finds it unnecessary to resolve this issue because it finds that Debtor did not cause McM to misrepresent its accounts payable on the YE 2015 and 1Q 2016 financial statements and the compliance certificate with intent to deceive, and BMO did not reasonably rely on these statements.

b.      Intent to Deceive

To meet its burden of proof, BMO must prove that Debtor acted with intent to deceive when he made or caused McM to make the allegedly materially false statements.  "Even if a false statement is made, no fraud exists unless the maker knows the statement is false at the time the statement is made."  Lindau v. Nelson (In re Nelson), 357 B.R. 508, 513 (B.A.P. 8th Cir. 2006).  The knowledge requirement can be satisfied with a finding that a debtor recklessly disregarded the truth by making the false representation under circumstances where he should have known it to be false.  The Merch. Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999) (quoting Fed. Trade Comm'n v. Duggan (In re Duggan), 169 B.R. 318, 324

60

(Bankr. E.D.N.Y. 1994)).  When assessing a debtor's knowledge that a representation was false, the court must consider the debtor's knowledge and experience.  Id.

A debtor's state of mind, including whether a debtor held the intent to deceive, is exceedingly difficult to prove.  Consequently, creditors may present circumstantial evidence sufficient to infer a debtor's intent.  In re Lindsey, 443 B.R. at 815.  "When the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor cannot overcome [that] inference with an unsupported assertion of honest intent."  Id.  "The focus is, then, on whether the debtor's actions appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor."  Id.

BMO argues Debtor acted with an intent to deceive BMO because, when Debtor made the representations related to the sums of accounts payable in the YE 2015 and 1Q 2016 financial statements and the compliance certificate, he knew that McM owed more than $3 million to input suppliers from 2015 and that McM would use a portion of the 2016 loan to pay those suppliers.  The Court agrees that Debtor knew McM owed more than $3 million to input suppliers from 2015 and that McM would use a portion of the 2016 loan to pay those suppliers when he provided the YE 2015 and 1Q 2016 financial statements to BMO.  The Court does not agree, however, that this knowledge demonstrates his intent to deceive BMO.

Since the 1980s, accountants prepared the financial statements Debtor or McM submitted to his/its lenders.  Before McM hired a bookkeeper, Debtor supplied his bank statements and other financial data to accountants who compiled or entered the data into software programs and then prepared financial statements.  In 2009 or 2010, after

McM hired a bookkeeper, Mortenson & Rygh persuaded McM to use QuickBooks and
assisted McM's bookkeepers with the data transfer.  Debtor granted Mortenson & Rygh
and Eide Bailly accountants the ability to access QuickBooks and the underlying data as
necessary to prepare McM's financial statements.  According to Debtor, Gauthier and
even Richard, Debtor did not enter data into QuickBooks.  Debtor testified that he never
told his staff what data to include or not to include in QuickBooks or in the general
ledger, and he did not tell the McM office staff how to do their jobs because he assumed
they were receiving directions from the accountants.

The evidence also shows that McM's bookkeepers entered accounts payable
data into McM's QuickBooks system consistent with cash basis accounting.  Debtor
testified that McM had always used cash basis accounting.  Although several witnesses
speculated that McM transitioned from cash basis to accrual basis accounting for a
short time in 2012 or 2013, BMO offered no conclusive evidence that McM ever
switched from cash basis to accrual basis accounting.  It is clear that Gauthier—who
was responsible for accounts payable data entry from 2013 through July 2016—did not
understand the difference between cash basis and accrual basis accounting, and she
did not enter supplier invoices, statements or delivery notices into QuickBooks
consistent with accrual basis accounting.

According to Gauthier, she did not enter several invoices from 2015 input
suppliers into QuickBooks prior to the preparation of the YE 2015 financial statements
because they were not due to be paid until March 2016.  Consequently, when she
shared the accounts payable aging report with Eide Bailly in early 2016, which showed
accounts payable totaled $24,659.79, this figure was correct according to the data entry

procedure she had used for years.  She continued to follow this procedure during the

spring of 2016.  As a result, the accounts payable figure included in the 1Q 2016

financial statement also reflected only accounts payable due and owing at the time.

Gauthier credibly testified that she thought she was doing a good job, and there is no

evidence she manipulated, or assisted Debtor in manipulating, McM's accounts payable

data.

      Similarly, there is no evidence that Debtor directly or indirectly manipulated

accounts payable data.  Debtor did not enter accounts payable data into QuickBooks,

and he did not tell Gauthier how accounts payable should be posted in QuickBooks.

Debtor never instructed McM's staff to send inaccurate accounts payable information to

BMO or Eide Bailly, and there is no evidence he misrepresented or concealed accounts

payable information at the time he provided the YE 2015 and 1Q 2016 financial

statements.[51]  To the contrary, several witnesses credibly testified that Debtor and McM

---

[51] BMO cites W. Builders of Amarillo, Inc. v. Morrison (In re Morrison), 361 B.R. 107, 126 (Bankr. W.D. Tex. 2007), for the proposition that Debtor had a duty to correct errors in McM's financial statement.  In In re Morrison, the debtor submitted a financial statement containing false information that the debtor knew was false.  Id.  The court reasoned that it may infer a debtor's intent to deceive from his failure to correct this false information.  Id.

      In contrast, Debtor maintains the accounts payable figures he provided were correct on a cash basis on the date he submitted the statements.  BMO offered no evidence that McM failed to record the 2015 input suppliers' invoices when it paid them (or at the end of the quarter in which they were due if McM did not pay the debts), consistent with its long-standing practice.  Likewise, there is no evidence that McM's accounts payable were inaccurate on either the YE 2015 or 1Q 2016 financial statements if McM used cash basis accounting.  Debtor's failure to advise BMO that McM recorded accounts payable on a cash basis is not evidence of his intent to deceive.  To the contrary, it might be viewed as evidence he either did not understand McM was required to use accrual basis accounting or he still assumed the use of cash basis accounting was appropriate.  In short, BMO failed to prove that Debtor knew McM's accounts payable totals were false at the time he delivered the financial

provided BMO all the information it ever sought.  Debtor maintains McM fairly and

accurately reported accounts payable data—under cash basis accounting.

BMO argues that the "problem with this position is that McM was not permitted to

use 'cash accounting' in its financial statements."  Doc. 137 at 3.  Although the Master

Loan Agreement required McM to provide BMO financial statements conforming to

"generally accepted accounting principles applied on consistent basis," the concept of

GAAP had no significance to Debtor as it related to McM's accounts payable data entry.

At best, he had a loose understanding of what some aspects of GAAP meant,

particularly as they related to the reporting of liabilities.  Debtor credibly testified that he

thought the contents of the financial statements were correctly prepared using the same

method McM had always used to provide financial disclosures to BMO and to McM's

prior lenders.  BMO did not show that Debtor knew and understood that GAAP required

presentation of liabilities differently than McM had always presented them.  Although he

expanded his farming operation into a large enterprise, Debtor is not an accountant.

McM's failure to provide financial statements conforming to GAAP may have been a

breach of the loan agreement, but it does not establish Debtor's intent to deceive.

Given Debtor's long history of employing accountants, granting them full access to

McM's financial data and relying on them to prepare financial statements, the Court is

also not convinced that Debtor's failure to research and understand all GAAP

requirements and train McM's bookkeeping staff accordingly was reckless under the

circumstances of this case.  See Blue Ridge Bank & Tr. v. Cascio (In re Cascio), 318

---

statements and that he intended to deceive BMO by failing to revise the method of
accounting or alert BMO that McM was using cash basis accounting.

B.R. 567, 575 (Bankr. D. Kan. 2004), aff'd, 342 B.R. 384 (B.A.P. 10th Cir. 2005)

(section 523(a)(2)(B) is meant to apply to those debtors who act with dishonest intent

and not to those who are merely careless or presumptuous); Hurston v. Anzo (In re

Anzo), 547 B.R. 454, 471 (Bankr. N.D. Ga. 2016) (courts should interpret reckless

disregard narrowly and section 523(a)(2)(B) does not apply to debtors who are merely

careless or presumptuous); Am. Gen. Fin. v. Merritt (In re Merritt), 2004 WL 316473, at

*2 (Bankr. C.D. Ill. Feb. 19, 2004) (section 523(a)(2)(B) is meant to apply to those

debtors who act with dishonest intent, not to those who are merely careless or

negligent).

      BMO also claims Debtor knew BMO required McM to use accrual basis

accounting.  There was no testimony that anyone from BMO told Debtor BMO required

McM to use accrual basis accounting.  Rather, BMO refers to Richard's testimony about

her conversation with Debtor in 2012 as the source of this knowledge.[52]

      In conjunction with her consulting engagement with BMO in July 2012, Richard

discerned that McM was using cash basis accounting.  She testified that she told Debtor

McM must use accrual basis accounting.  Debtor did not recall Richard telling him this,

however, and asserted that he never had a discussion with Richard or anyone from

Eide Bailly during which someone told him McM must use accrual basis accounting.

Richard did not recall Debtor affirmatively acknowledging his understanding of the

---

[52] BMO also highlighted note 1 to the YE 2012 and YE 2013 financial statements
prepared by Mortenson & Rygh, in which the accountant represented that these
financial statements were reported using the accrual basis of accounting.  Debtor
claimed he generally does not read the notes in financial statements and did not read
this one.  Given other evidence regarding McM's bookkeeping practices, the Court finds
this testimony credible.

required change.  Although Richard generally recalled discussing with Debtor how McM purchased input supplies, she did not recall the discussion specifically and testified generically that "any discussion <u>would have been</u> around accrual basis accounting and the requirement to record the payables when they were payable."  BMO-313 at 36 (emphasis added).

The Court finds the testimony of both Richard and Debtor credible and reconciles it by finding that, to the extent Richard discussed the proper way to record payables on an accrual basis—notably, in 2012, several years before the representations at issue—the conversation was not extensive or detailed enough for it to have been memorable or appreciable to Debtor.

Richard did not recall any conversation with anyone from McM about whether McM was accruing income and expenses after Eide Bailly took over McM's accounting in the fall of 2014.  Instead, she "assumed" it and never asked whether there were accounts payable or unpaid liabilities for input supplies.  Richard's testimony was riddled with statements about what Eide Bailly "would have" done, but there is a dearth of evidence regarding any action Eide Bailly actually took to ensure that Gauthier or Debtor understood how to record payables consistent with accrual basis accounting. Gauthier handled McM's payables at the time, and she thought Eide Bailly instructed her how to handle payables "as I had always been doing them."

BMO identifies several incidents it claims demonstrate Debtor's intent to deceive. For example, BMO highlights Debtor's refusal to allow BMO to respond to a credit inquiry as evidence of Debtor's intent to deceive.  McM listed BMO as a credit reference in its credit request to CPS.  When CPS sought authorization from Debtor to ask BMO

about McM's credit status, Debtor refused to provide authorization.  CPS initiated this inquiry in April 2016, just before BMO granted the 2016 operating loan to McM.  BMO claims that, if Debtor had provided authorization for BMO to communicate with CPS, "BMO more than likely would have learned the accurate information about the 2015 accounts payable balance, and it could have declined to provide the 2016 Crop Loan." Doc. 137 at 30.  BMO claims Debtor cloaked his concerns in privacy issues and asked BMO not to communicate with CPS because he did not want CPS to reveal to BMO that he had provided false information to BMO that might prompt BMO to disapprove the 2016 loan to McM.  Id.

BMO also points to Debtor's conversation with Richard in August 2017, during which she asked Debtor about $3 million in debts to 2015 input suppliers that were not included in the YE 2015 financial statements.  According to Richard, Debtor admitted he had not disclosed them to Eide Bailly.  When Richard asked why, Debtor was silent.

BMO's interpretation of Debtor's purpose and motives in these incidents is speculative.  Further, the connection between this circumstantial evidence and the question of whether Debtor intended to deceive BMO by misrepresenting McM's accounts payable by using cash basis accounting instead of accrual basis accounting is tenuous.  As such, the Court concludes these facts are of limited relevance and probative value to the accounts payable representations BMO claims are false.

Finally, BMO suggests that Debtor's intent to deceive is demonstrated by the $500,000 he borrowed from Berg in the fall of 2015 because he did not disclose this loan to BMO or list it on the financial statements or compliance certificate as of September 20, 2015.  BMO further argues that Debtor's decision to use this loan and

other funds he raised to invest $3,082,000 in McM but request that Gauthier record it as 2014 potato revenue, and his request that Jackson refrain from disclosing this information to BMO, is evidence of Debtor's intent to conceal information and deceive.

Like the other examples listed above, this information bears little relevance to the question of whether Debtor intended to deceive BMO by misrepresenting McM's accounts payable by using cash basis accounting instead of accrual basis accounting. Unlike the incidents described above, this example unquestionably demonstrates Debtor's intent to conceal material financial information from BMO.  While this incident certainly reflects poorly on Debtor's credibility as a whole, the greater weight of the evidence shows Debtor's and Gauthier's testimony regarding McM's bookkeeping method and McM's accounts payable processing was credible.  Considering all the surrounding circumstances, the Court finds that the evidence regarding Debtor's actions and representations related to McM's accounts payable in the YE 2015 and 1Q 2016 financial statements and the compliance certificate does not establish that Debtor caused McM to make these representations with intent to deceive.[53]  BMO failed to meet its burden of proving this element of its section 523(a)(2)(B) cause of action.

c.    Reliance

BMO must demonstrate that it actually relied upon the false financial statements and compliance certificate and that its reliance was reasonable under the

---

[53] BMO does not list Debtor's misrepresentation that his $3 million contribution was 2014 potato revenue among the written statements it claims were false, and it makes no assertion that it actually and reasonably relied on this representation in making its decisions to loan funds to McM in 2016.  Accordingly, this representation does not serve as separate grounds to deny Debtor a discharge under section 523(a)(2)(B).

circumstances.  See Hous. Auth. of St. Louis Cnty. v. Reed (In re Reed), 2017 WL

1497822, at *2 (Bankr. E.D. Mo. Apr. 26, 2017) (citation omitted); Horizon Fin. Bank v.

Borstad (In re Borstad), 550 B.R. 803, 837 (Bankr. D.N.D. 2016) (citation omitted).

Partial reliance is all that is necessary; the misrepresentation need only be a

contributing cause to BMO's decision to extend credit.  See id.

i.    Actual Reliance

BMO asserts that Mueller's reliance on the YE 2015 and 1Q 2016 financial

statements is expressly demonstrated in the Form 959, in which Mueller recommended

approval of the 2016 loan.  See BMO-260.  Although she did not specifically address

the sum of accounts payable, Mueller discussed the contents of the draft YE 2015

financial statements in the document.  The sum of accounts payable was a component

of McM's overall financial situation, and Mueller testified that she relied on the financial

statements in recommending BMO approve the 2016 operating loan.  She maintains

that, if she had known that McM failed to include more than $3 million in invoices for

2015 input supplies in the YE 2015 accounts payable total, she would not have

recommended BMO approve the 2016 $8 million operating loan to McM.  Based on

Mueller's testimony and loan documentation, it appears that Burke, Hirji and Wood

considered Mueller's Form 959 summary of McM's financial status in recommending or

approving the loan to McM.  See BMO-264; BMO-265; BMO-267; BMO-268.  Neither

Burke, Hirji nor Wood mentioned McM's accounts payable, or even its YE 2015 and 1Q

2016 financial statements in their comments, however.

The picture that emerges from the evidence is one in which BMO officials

recommended and approved the 2016 loans to McM because they believed McM was

69

more likely to pay its debt in full if McM operated in 2016. Mueller, Burke, Hirji and

Wood focused their analysis on McM's $8 million investment in future crops. BMO

officials understood that the only way to recoup this investment was to approve the

loan(s) necessary to allow McM to operate in 2016. As Mueller explained, "BMO could

expect to lose $13 million (maybe more)" if it did not extend credit to McM in 2016 and

opted to liquidate McM's assets. BMO-244. By comparison, she projected that, if BMO

funded McM's 2016 operation but ensured that no funds were spent on McM's 2017

operation, McM's outstanding debt to BMO would total approximately $5.3 million.

This overarching concern is evident from BMO's continued tolerance of McM's

numerous loan covenant defaults and decreased risk rating. In fact, in early August

2016—after BMO learned 2016 accounts payable totals were higher than expected,

potato accounts receivable and inventory were substantially lower than expected, McM

farmed fewer acres than planned and McM violated numerous loan covenants—Hirji

opined that the original rationale to fund the 2016 crop year was still sound.[54] Given the

number and magnitude of the defaults (and the overall loan sums), the accounts

payable variance appears fairly insignificant, suggesting that if BMO had knowledge that

some 2015 input suppliers had not been paid and McM planned to purchase some 2016

input supplies on credit, this knowledge would have been unlikely to deter BMO from its

decision to lend McM money in 2016. Even Mueller conceded that she did not know

_____

[54] Citing D-234, Debtor claims that, as of the end of July 2016, "[BMO] was aware
of the mistake in McM's financial statements with respect to the accounts payable."
Doc. 136 at 10. D-234 includes no statements suggesting that BMO knew McM used
cash basis accounting, that McM did not record 2015 input expenses payable in 2016 in
its YE 2015 financial statements or that it paid 2015 input suppliers with 2016 loan
proceeds. The Court found no evidence that BMO knew about "the mistake in McM's
financial statements with respect to the accounts payable" until late August 2016.

whether a "correct" reporting of McM's accounts payable would have impacted BMO's ultimate decision to make the 2016 loan.

Although partial reliance is all BMO must show, the Court is not entirely convinced that BMO actually relied on the sum of McM's accounts payable represented in the YE 2015 and 1Q 2016 financial statements in recommending BMO approve the 2016 loans. The Court need not decide this issue because it finds that BMO's reliance was not objectively reasonable.

### 4.     Reasonable Reliance

Reasonable reliance is determined by reviewing the totality of the circumstances. First Nat'l Bank of Olathe v. Pontow, 111 F.3d 604, 610 (8th Cir. 1997); see also Guess v. Keim (In re Keim), 236 B.R. 400, 402–03 (B.A.P. 8th Cir. 1999). Among other circumstances, a court may consider whether there were "red flags" that would have alerted an ordinary prudent creditor to the possibility that the representation was not accurate and whether even minimal investigation would have revealed the inaccuracy. Pontow, 111 F.3d at 610; In re Keim, 236 B.R. at 403. Additionally, "the stringency of the reasonableness standard varies with the lender's sophistication." Kunzler v. Bundy (In re Bundy), 95 B.R. 1004, 1009 (Bankr. W.D. Mo. 1989).

As BMO identifies, the issue is not whether it was reasonable for BMO to have made the 2016 loans to McM, but whether it was reasonable for BMO to have relied on Debtor's representations regarding McM's accounts payable in the YE 2015 and 1Q 2016 financial statements in making the loans. BMO asserts that its reliance on McM's financial statements was reasonable because it required GAAP financial statements and the disclaimer by Eide Bailly in its cover letter to McM's YE 2015 financial

statements provided assurance to BMO that the financial statements were prepared in

accordance with GAAP accounting, which required accrual basis accounting.  BMO

further asserts its reliance was reasonable because it engaged Eide Bailly to review

McM's accounting procedures in 2012.  Because Richard reportedly told Debtor in 2012

that BMO required McM to use accrual basis accounting for its financial statements,

BMO claims its assumption that the accountants prepared these financial statements

using this method and its reliance on this fact was reasonable.  It maintains there were

no red flags suggesting otherwise.

BMO seems to suggest that it could blindly rely on the information in McM's

financial statements because an accountant prepared them.  Although lenders do not

have a duty to verify the accuracy of every financial statement they receive, they may

not ignore industry standards, red flags and glaring inaccuracies and inconsistences

and persuasively assert reasonable reliance.[55]

BMO points to its consulting engagement with Richard from Eide Bailly in July

2012 as the foundation for its claim that it reasonably relied on McM's accountants'

representations that McM used accrual basis accounting.  In her report following the

consulting engagement, Richard highlighted the fact that McM used cash basis, not

accrual basis accounting.  Although Richard testified that she discussed the distinction

---

[55] See Branch Banking & Tr. Co. v. Adam (In re Adam), 406 B.R. 717, 721
(Bankr. E.D. Va. 2009) ("Lenders must follow reasonable industry practices but are
otherwise under no duty to verify the accuracy of every entry in a financial statement
regular on its face."); Insouth Bank v. Michael (In re Michael), 265 B.R. 593, 600 (Bankr.
W.D. Tenn. 2001) (although a lender does not have an independent duty to verify the
absolute accuracy of a financial statement, it cannot ignore red flags and glaring
inaccuracies and inconsistencies and later assert reasonable reliance).

between cash and accrual basis accounting with Debtor and told him that McM must convert its financial statements to an accrual basis, she did not recall the specifics of this conversation with Debtor and she was not sure whether she discussed the need for McM to prepare year-end financial statements using accrual basis accounting. Richard did not recall Debtor affirmatively acknowledging his understanding of the required change. Richard did not discuss the need to use accrual basis accounting with Beck, McM's bookkeeper at the time. Most importantly, no one from BMO or Eide Bailly took steps to ensure that McM employees understood the distinction between the accounting methods and no one verified that McM actually converted from cash basis accounting to accrual basis accounting. The Court is not persuaded that Richard's report serves as an objectively reasonable assurance that McM's bookkeepers entered invoices consistent with accrual basis accounting in 2012 and even less sure this report served as assurance that McM used accrual basis accounting in 2016 when Debtor caused McM to make the allegedly false statements.[56]

Within six months after Richard's report, Sloan observed that McM's accounts payable decreased by more than $9 million between the 3Q 2012 and YE 2012. He reasoned that the reduction was consistent with McM paying accounts payable in the fourth quarter, but he did nothing to confirm his understanding. McM's accounts payable history shows significant variations between YE 2009 and 1Q 2016. The accounts payable total of $24,660 reported in the YE 2015 statements at issue was among the lowest balances reported. The evidence also shows that McM's revenue

---

[56] This conclusion is supported by Enger, who also opined that Richard's field exam did not give a reasonable commercial lender a basis to believe McM's accounting and reporting systems were reliable because of the limited nature of the exam.

grew significantly between 2009 and 2015, but the accounts payable balances
(especially the balance in the YE 2015 and 1Q 2016 financial statements) did not mirror
McM's growth as an objectively reasonable lender might expect.  See Larson's
testimony, supra note 16.  Despite the accounts payable variations and the lack of
correlation between accounts payable and total revenue, Sloan was not concerned that
McM returned to using cash basis accounting, and neither he nor anyone else at BMO
made inquiries about it.  At the very least, Richard's discovery that McM used cash
basis accounting was a red flag and, together with other circumstances, would have put
a reasonably prudent lender of loans exceeding $25 million on notice that it should be
diligent about verifying—or demanding that McM's accountants verify—McM's
information, systems and reporting.

BMO argues that it should not be criticized for never attempting to determine
whether McM transitioned from cash accounting to accrual accounting because McM's
reviewed financial statements "answered that question definitively."  Doc. 139 at 8.
Because the statements were reviewed and Eide Bailly applied analytical procedures,
BMO asserts it was entitled to rely on the representation that McM was using accrual
accounting.

Contrary to BMO's argument, the Court is not convinced that the analytical
procedures Eide Bailly applied assured BMO that McM used accrual basis accounting.
More importantly, the Court is not convinced that a reasonable and prudent commercial
lender of funds in excess of $25 million faced with the same circumstances presented in
this case would assume that the data McM's bookkeepers input into QuickBooks
reliably reflected revenue and accounts payable on an accrual basis.  The evidence

shows McM's bookkeepers did not enter accounts payable until they paid the expense

or until the end of the quarter in which the bill was due, which is consistent with cash

basis accounting.  There is no evidence that employing these analytical procedures

detected or could have detected this practice.  Had BMO demanded audited financial

statements, the accountants would have discovered this data entry issue, according to

Richard and two expert witnesses.  BMO did not demand audited statements, and

McM's accountants did not provide them.  Instead, the YE 2015 and 1Q 2016 financial

statements were reviewed statements.  In its "Independent Accountant's Review

Report" attached to the financial statements, Eide Bailly disclaimed any assurance

regarding the accuracy of the information in them.  In other words, the Eide Bailly

accountants, who provided reviewed statements, did not provide any assurance that

McM's bookkeepers entered accounts payable data consistent with accrual basis

accounting.  Notably, the preparation of a financial statement in accordance with GAAP

does not mean the accountant verified that the underlying data is reliable.  Mueller

admitted she had no reason to believe Eide Bailly attempted to verify any data it was

receiving from McM, and Eide Bailly never told Mueller McM's accounting system

should be considered reliable.  Neither Mueller nor Sloan asked Eide Bailly if it did

anything to test the information, and neither had reason to believe Eide Bailly attempted

to determine the accuracy of the information McM provided.  Thus, while the

accountants "definitively" represented that they used accrual accounting, this

representation does not equate to reasonable reliance because a reasonable lender

faced with the circumstances in this case would have demanded audited financial

statements or taken other steps to ensure the data McM's bookkeepers entered reliably reflected accrual basis accounting principles.

BMO also argues its reliance on the financial statements was objectively reasonable because its policy did not require it to obtain audited financial statements for the lending relationship with McM. BMO's policy provided that, for business loans of $2 million or more, "reviewed statements are acceptable for many businesses, provided that the customer's underlying accounting and reporting system is considered reliable." Doc. 137 at 19 (citing D-135). BMO's policy did not mandate any formal procedure for evaluating the reliability of a customer's accounting and reporting system.

BMO maintains it complied with this policy by hiring Eide Bailly to conduct an analysis of McM's accounting procedures in July 2012, but it did nothing to ensure that McM's bookkeepers entered data consistent with Eide Bailly's advice regarding implementation of accrual basis accounting after the consulting engagement.

Additionally, BMO disregarded another portion of its policy which provided that, in determining whether to require audited statements, the following factors should be considered:

- The Bank's knowledge of the customer
- The financial strength of the customer
- The reliability of the customer's accounting/reporting system
- The quality and quantity of the collateral
- The terms and conditions of the loans

The evidence shows these factors weighed strongly in favor of requiring audited statements. By YE 2014, BMO knew McM's financial strength was questionable. McM suffered more than $4.5 million in losses in both 2014 and 2015, and it was in default on many of the loan covenants. The Court already discussed the dubious state of McM's

accounting and reporting system, and there is no evidence BMO ever verified its collateral before funding the 2016 loans. BMO's failure to properly assess these factors and require audited statements is further evidence that it did not follow its policy regarding the 2016 loans to McM. If BMO relied on McM's reviewed financial statements, it did so in contravention of its own policy, which is further support for finding that it did not reasonably rely on Debtor's representation regarding accounts payable in its financial statements. After considering all the facts and circumstances supported by evidence, the Court concludes that BMO failed to establish reasonable reliance under section 523(a)(2)(B). Accordingly, the Court concludes that BMO did not meet its burden of proving its section 523(a)(2)(B) claim.

The Court considered all other arguments and deems them to be without merit.

## IV.    CONCLUSION

For the reasons stated above, the Court finds and concludes that BMO failed to establish its claim against Debtor under 11 U.S.C. § 523(a)(2)(B). This claim and cause of action is dismissed with prejudice. BMO waived its claim under 11 U.S.C. § 523(a)(6). This claim is also dismissed with prejudice.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated:  February 26, 2021.


SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT